JONES V. GLIDEWELL.

Decided April 19, 1890.

1.  *Circuit judge's findings of fact—Conclusiveness at law.*

Where, as in election contests, a circuit judge is at law the trier of facts, his findings are as conclusive as the verdict of a jury.

2.  *Elections—Efforts to enforce unanimity.*

Efforts on the part of black citizens to enforce unanimity in politics among voters of their race through the influence of the church, ostracism from society and indignities which fall short of intimidation will not avoid an election.

3. *Secret elections—Constitutional guaranty.*

The constitutional requirements that popular elections shall be "by ballot" and be "free and equal" (Art. 3, secs. 2, 3), are violated by a systematic plan to coerce voters to deposit their ballots in such manner as to disclose their contents to bystanders.

4. *Secret ballot—Waiver.*

The secrecy of the ballot is a personal privilege which the voter may waive if he wish, but of which he cannot be lawfully deprived. Where he is put to the alternative of showing his ballot to bystanders or being subjected to odium and ignominy if he refuses, he cannot be said to waive the privilege of secrecy, but surrenders it under compulsion.

5. *Annulment of election—Doubtful result.*

To justify the annulment of an election, it is not necessary to show that a majority of the electors were actually prevented from voting or voted against their wishes; it is sufficient to show that wrongs against the freedom of election have prevailed, not slightly and in individual cases, but generally and to the extent of rendering the result doubtful.

6. *Purging the poll.*

Where illegal or wrongful acts render the result of an election doubtful, the law will require the party to whose benefit they inure to purge the poll or suffer the penalty of having its majority excluded from the count of his votes.

7. *Examination of witnesses—Discretion of court.*

The discretion of the trial court in limiting the time of examining witnesses will not be interfered with, where no abuse thereof is shown.

APPEAL from *Pulaski* Circuit Court.

J. W. MARTIN, Judge. ·

*F. M. Fulk, Compton & Compton* and *Blackwood & Williams* for appellant.

The judgment of the court below was contrary to the evidence.

Every individual case of alleged bulldozing was entirely disproved. In nearly every township and ward where intimidation and bulldozing is alleged, contestee sought to establish it by some negro who is a cross between a political bummer and a "licentious" preacher. And in every instance

where a respectable, disinterested white man swore, he testified that it was the most quiet and peaceable election he had ever seen, that there were no fights or disturbances, or arms or armed men around the polls, no angry talk; that he saw no one interfered with in his right to vote. There was no concert of action, or force or compulsion used to make any one vote an open ticket. Take these facts and compare with the election in the *Patton—Coates* case and see what a difference. 41 Ark., 136. The judges and clerks were not interfered with; no proof of violence or threats of violence. An election cannot be avoided because some cowardly negro gets scared. Judge Eakin carefully distinguishes between cases where fraud and intimidation are flagrant and general, and pre-arranged and premeditated, and those where they are slight and immaterial. See 41 Ark., 126. Any other rule would lead to a most deplorable result, the abolition of popular elections. No party, nor the candidates of any party, can padlock the mouths of a few bullies. There are always loud-mouthed partisans who will talk, and if the courts gave credence and effect to such talk, it would simply encourage fraud, bribery and corruption.

Voting open tickets was simply that a tally might be kept, and was inaugurated in order to reap the benefit of the votes cast, which previously had not been counted. While every voter is entitled to a secret ballot and cannot be compelled to disclose how he voted, yet it is a personal privilege that he may waive. 49 Ark., 242. Bogus tickets and stripped tickets are both fraudulent devices and are entitled to no consideration. McCrary on Elections, secs. 647, 655.

The court abused its discretion in permitting contestee to take up *ten* days in introducing evidence to show intimidation, and in limiting contestant to three.

The returns and findings of the election officers are *quasi* records and *prima facie* evidence of the result. 50 Ark., 95. When contestant made his case by *prima facie* evidence, the

burden was shifted to contestee to establish by *affirmative* proof that they do not speak the truth. If they rely on intimidation, they must establish it by evidence sufficient to set aside the returns. This has not been done. There is a difference in setting aside the returns and the election. The *election* is only to be set aside when it is impossible to ascertain the true result. McCrary, Elec., sec. 483.

The proof in this case does not show more than four or five voters who were changed, or that there was any pretense that more than this number were kept from voting under any pretext.

The court below based its judgment solely on the ground that there was such intimidation as rendered the result doubtful and for that reason void, and relied upon 41 Ark., 111. But he misapprehended the grounds upon which that case stands. Then there was a *design and preconcerted* plan for the introduction of fraudulent votes, which, taken with intimidation, avoided the election in the sixth ward. 41 Ark., 144. Fraudulent voting and intimidation concurred in that case in this there is evidence of neither. The judgment should be reversed, and judgment entered here for Jones.

*F. T. Vaughan*, *T. B. Martin* and *W. L. Terry* for appellee.

The burden is on him who assails the findings of the lower court. 31 Ark., 479; 36 Ark., 261. The circuit judge had the witnesses before him, observed their manner of testifying and his finding is entitled to the same weight as the verdict of a jury. Elections cannot be said to be free when fear deters from the exercise of free will, although there may no turbulence. 41 Ark., 124, 144. *The most effective work of intimidation had been accomplished before the day of election*, and only the *visible signs of its machinery* at work the polls were the "committees," "spotters," the system voting the "open ticket," and the remarks of "Democra

nigger," "mark him," "take his name down," "we will remember him," etc., and like *threatening remarks*. This is intimidation of the most potent character. The evidence shows social and church ostracism, threats, denunciations and other bitter, proscriptive methods adopted to prevent a free ballot. If there was *any* evidence to support the finding of the court it should be sustained.

One of the issues in this case was whether there was prevailing among a large number of colored voters a state of mind or feeling that it would not be safe for them to vote the Democratic ticket. Any fact or circumstance which would naturally tend to produce such state of mind or feeling was relevant, such as reports circulated, or rumors all through the community. Stephen's Dig., Ev., art. 2, p. 18; Whart., Ev., vol. 1, secs. 20, 21; 42 Ark., 554. These rumors *naturally tended to deter* and *did deter* negroes from voting the Democratic ticket. Whart. on Ev., vol. 1, sec. 254.

Religious ostracism is to be regarded as intimidation or undue influence *in itself*, and not *a circumstance* that may be looked into in connection with other evidence to show whether or not there was in fact intimidation. Paine on Elections, sec. 472; A. & E. Enc., Law, vol. 6, p. 362.

The circuit court *did find the particular facts constituting intimidation*, and that they were such as to render the *result doubtful*. This was sufficient without particularizing the precincts. The judgment is right on the whole case, and the *reasons* and *methods* in arriving at the conclusion are immaterial. This appeal only involves a *question of fact*, and this court does not reverse, unless for utter want of testimony. 1 Ark., 479; 36 Ark., 261.

The *Patton v. Coates* case, 41 Ark., 146–7, settles the law.

COCKRILL, C. J. Jones and Glidewell were opposing candidates for the office of county treasurer of Pulaski county the general election in 1888. Glidewell received the cer-

tificate of election, and entered upon the duties of the office. Jones thereupon instituted this contest for the office. In the circuit court, where the cause was heard on appeal from the county court, the judge found that Jones had received a majority of the votes cast at the election, but refused to award him the office upon the ground that the evidence showed that his adherents had been guilty of illegal practices of such character and so wide spread as to avoid the election. Jones contends that the finding is not warranted by the testimony, and asks us to review the evidence for the purpose of reversing the judgment on that ground.

1. Circuit judge's findings of fact—Conclusiveness.

It is not the practice of appellate tribunals, and has never been the practice of this court, to enter anew into the investigation of issues of facts which have been tried in a law case by a circuit judge upon conflicting testimony. When a jury is waived by the parties, and the issues of facts are tried before the judge, his findings of fact are as conclusive on appeal as the verdict of a jury; and when the law makes the judge the trier of facts in cases to which the constitutional right of trial by jury does not extend, the same presumption attends his findings. *Corley v. State*, 50 Ark., 308. The reasons which sustain the rule in the one case exist as well in the other. The statute has not established a different rule for election cases, and there is nothing in the policy of the law to warrant the courts in doing so. On the contrary, the rule was followed in *Powell v. Holman*, 50 Ark., 85, and in *Wheat v. Smith, ib.*, 275; and in *Patton v. Coates*, 41 Ark., 111, the cause was remanded to the circuit court for a new trial, whereas if the court were at liberty to review the facts as in an equity case, judgment would have been entered here in accordance with this court's conclusion upon the facts. But while we will not enter upon an investigation to ascertain where the weight or preponderance of the testimony lies, it is our province to determine whether a given finding or verdict has testimony to sustain it; and where there is no con-

flict in the evidence, or the facts are specially found, the con-
clusion of law or judgment to be deduced therefrom is purely
a question of law to be finally determined by this court.

In the case at bar the court found generally for the con-
testee, refused the contestant's request to find that the evi-
dence of illegal practices was not sufficient to warrant the ex-
clusion of the vote of any precinct, and made a special find-
ing of facts.

The trial consumed many days, and the record is volumin-
ous.    The evidence which counsel have pointed out as
material is in hopeless conflict upon most of the issues, but
these conflicts have been determined by the trial judge in
favor of the contestee, and that determination is, as we have
seen, final.   The questions are, what conclusions of fact could
the trial court legally draw from the evidence, and what
judgment does the law pronounce upon those conclusions?

It may be said that a preponderance of the testimony
shows that at the outset of the campaign many of the negro
electors of Pulaski county evinced a desire to vote for favored
candidates on the Democratic ticket—the contestee among
the number; that, as the election approached, a bitter feel-
ing was engendered against them among the people of their
own race on that account; that it grew to such an extent
that negro adherents of the Democratic ticket were silenced
in public meetings, stoned in political parade, and cut off in
a great measure from the society and sympathy of their race,
or threatened with that fate if they persisted in so doing.
There was testimony tending to show that ministers of the
gospel were threatened with deprivation of their pastorates,
and members of churches of the privilege of worship in their
accustomed places, if they persisted in the design of voting
for a Democrat; and that voting with that political party
was denounced as a sin from some of their pulpits, and that
the church influence was potent with the negro race.   The
practice was disproved as to the other negro churches, and it

2. What efforts
to enforce una-
nimity will not
avoid an election.

was shown that some of their most intelligent and influential
men who were adherents of the contestant discountenanced
all these practices and advised the electors to vote intelligently
and as they pleased.

But that this spirit of animosity was common in the town-
ships where the black race predominated, the preponderance
of the evidence establishes; and that threats of social ostra-
cism, of expulsion from the community, of personal violence
and of persecutions from Republican candidates for township
offices in case of success, and many indignities which the cir-
cuit judge has specially pointed out, were freely indulged in,
even to the close of the polls on election day, the circuit
judge has specially found from evidence which we are not at
liberty to disregard.   These influences operated with more
or less intensity at different localities, but the court was justi-
fied in finding they were the result of a common spirit on the
part of a large part of the black citizens to enforce their
political views at the polls against those of their race who
were disposed to differ from them.   To make the plan effec-
tive, political societies were formed just before the election,
in some of which it was resolved, and in others the members
were sworn, to vote open or unfolded tickets.   The circuit
judge, after finding that a systematic plan was arranged before
the election to have all the negroes vote open tickets and that
it served the purpose of keeping a reasonably accurate tally
for testing the returns of the election officers and also of dis-
closing to his fellows any negro voter who might try to slip
in what was called "a Democratic split or stripped ticket,"
by which was meant a Union Labor or Republican ticket con-
taining the names of Democrats pasted or written on the
printed form, concluded as follows:   "This (the latter)
object seemed to be especially emphasized by the fact that
when a colored man would try to vote without exhibiting his
ticket, the cry was often raised, 'Democratic negro,' 'mark
him,' 'spot him,' 'we will remember him,' and various such

like methods.  Representative colored men were shown to be at the polls for the purpose of keeping these tallies, examining their ballots, and noting how all colored men voted. There did not appear to be as much noisy demonstration at the polls as had been made on former occasions, but those regulations as to open tickets, voting and keeping tallies seem to have been very persistently and strenuously enforced in many of the outside townships; and, as was said by some of the witnesses, it was almost impossible for a colored man to get in a vote for any part of the Democratic ticket, that is by 'stripping' his ticket, without it being discovered. And many of the witnesses testified that the colored men, with few exceptions, did not like to have it known that they were voting any part of the Democratic ticket.''

The case of *Patton v. Coates*, 41 Ark., *supra*, presents many of the same features as the case at bar, but there is a marked distinction between the two.  There is proof here of the same spirit of intolerance, of the same efforts on the part of the blacks to enforce unanimity in politics through the influence of the church, ostracism from society and indignities which fall short of intimidation as defined in that case.  But there is lacking in this case the element of threats and acts of violence, without which the judgment avoiding the election in that case would not have been reached.  There is some proof in this case of threats and of actual violence towards negro electors who desired to vote the Democratic ticket, but it was not general and would not justify the conclusion that it prevailed to such an extent as to render the result doubtful.  There is however one element in this case which did not enter into the *Patton–Coates* case, and that is the plan of requiring voters to deposit their ballots in such a manner as to disclose the contents to the bystanders. The effect of such a practice upon an election presents an important question for determination.

The constitution declares that ''all elections by the people

3. Constitu-
tional guaranties
of secret elec-
tions.
shall be by ballot;'' that ''elections shall be free and equal;'' and that ''no power, civil or military, shall ever interfere to prevent the free exercise of the right of suffrage.'' Art. 3, secs. 2 and 3.

The system of voting by ballot has been generally though not universally adopted in the United States, and within a score of years was adopted in England. Public or *viva voce* voting is still partially preserved at least in the State of Kentucky, the advocates of the system claiming that it prevents hypocrisy and tends to preserve the individual sense of responsibility. On the other hand, it is believed that the ballot promotes tranquillity at elections and gives greater security for independence of thought; that it presents an obstacle to coercion by undue influence, by ''uncovering men's faces and concealing their thoughts;'' and that it checks bribery through the uncertainty that the bribed party will vote as he promised. These, which are some of the leading reasons for the adoption of the system of voting by ballot, are all based upon the idea of secrecy. ''The distinguishing feature of this mode of voting,'' says Judge Cooley, ''is, that every voter is thus enabled to secure and preserve the most complete and inviolable secrecy in regard to the persons for whom he votes, and thus escape the influence which, under the system of oral suffrages, may be brought to bear upon him with a view to overbear and intimidate, and thus prevent the real expression of public sentiment.'' ''The system of ballot-voting,'' he continues, ''rests upon the idea that every elector is to be entirely at liberty to vote for whom he pleases and with what party he pleases, and that no one is to have the right, or be in position, to question his independent action, either then or at any subsequent time.'' Const. Lim., pp. 604–5.

Many of the States have provided statutes prohibiting a ballot from being received or counted if, by color, mark or exterior device, it can be distinguished from other ballots.

That these statutes are enacted only to secure, as perfectly as possible, the benefits of secrecy, which the ballot system itself was intended to secure, is attested by all the adjudicated cases on the subject.

"The object of such acts," say the Supreme Court of Indiana, "is evidently to protect the elector from the undue influence and control of others and secure to him entire freedom of opinion in the exercise of the elective franchise, by enabling him to cast his vote in such manner as to prevent others, who, from their particular relations to him, might by intimidation or otherwise seek to control his vote, from being able to determine from the color of the ticket or some distinguishing mark thereon the party or person for whom he voted." *Druliner v. State*, 29 Ind., 308. "The purpose is," say the Supreme Court of Minnesota, "to protect the secrecy of the ballot so as to secure the voter against intimidation, and not to compel men to vote the 'straight ticket.' " *Quinn v. Markoe*, 37 Minn., 439. These views of the object of the vote by ballot are sanctioned by all the authorities. McCrary on Elections, sec. 454 *et seq.; Williams v. Stein*, 38 Ind., 89; *Brisbin v. Cleary*, 26 Minn., 107; *People v. Cicott*, 16 Mich., 283; S. C. 97 Am. Dec., 141 and note; *Attorney Gen'l v. Detroit Common Council*, 58 Mich., 213; *Woodward v. Sarsons*, 10 L. R., C. P., 733.

So jealously have the courts guarded the right, when it is secured by the constitution, that acts of legislatures requiring election officers to number the ballots as they are cast have been held to be void because they afford the opportunity of raising the veil of secrecy which the constitution guarantees to the voter. *Williams v. Stein*, 38 Ind., *supra; Brisbin v. Cleary*, 26 Minn., *supra*. See *Hodge v. Linn*, 100 Ill., 397. The framers of our constitution saw proper to remove this difficulty by providing in that instrument for the numbering of the ballots, but the officers to whom the arrangement of secrecy is intrusted by the constitution can

divulge it only by the violation of a trust which the law declares a crime.

As further evidence of the regard the law entertains for the secrecy of the ballot, a voter can not be compelled to disclose for whom he voted by a court of justice. *Dixon v. Orr*, 49 Ark., 238. And this results not from any direct prohibition found in the statute or constitution, but because the privilege of secrecy is inherent in the constitutional guaranty of a vote by ballot. If then the right is so carefully guarded against infringement by the legislature, and public policy prohibits the enforced disclosure by the voter in the courts of the contents of his ballot, can it be held that the adherents of a candidate may, by an enforced system of open voting at the polls which the voter can not escape without incurring their odium, defeat the fundamental object of the ballot system? "Such a view," says Judge Cooley, "would establish this remarkable anomaly that while the law, from motives of public policy, establishes the secret ballot with a view to conceal the elector's action, it at the same time encourages a system of espionage, by which the veil of secrecy may be penetrated and the voter's action disclosed to the public."

The practice is certainly inconsistent with the secrecy of the ballot—the question is, does it avoid the election?

4. Waiver of secrecy of ballot—Coercion. The constitution makes a vote by ballot of the essence of an election by the people. Its mandate prohibits the legislature from interfering with the system, and binds the electors themselves to its observance. Neither can dispense with it. The elective franchise is not an unrestrained license; it can be exercised only in accordance with the law. An election held by *viva voce* voting, although it should fairly record the will of the people, would not be a constitutional election. It must be conducted in accordance with the principles of an election by ballot, or it is no election. But an election by ballot means at least the privilege of exercising the elective

franchise in secret, and any system practiced at the 'polls which makes it reasonable to believe that the electors have been prevented by the deprivation of secrecy from electing the candidate whom a majority preferred, is an illegal annulment of the will of the majority, and not a lawful election of the unpreferred candidate, whatever the ballots actually cast may purport to show. The secrecy of the ballot is a personal privilege which the voter may waive if it is his wish, but of which he cannot be lawfully deprived; and any practice at a poll which defeats the freedom of action of enough electors to render the result doubtful, destroys the freedom of the election. *Patton v. Coates, supra.* The use of different colored ballots by political parties by which party managers are enabled to distinguish ballots in the hand of the voter, though opposed, as Judge Cooley points out, to the spirit of the constitution, does not avoid the election (Cooley's Const. Lim., p. 605), because it is still the voter's privilege to change the ticket as he may desire, so that the exterior shall not in fact proclaim its contents. But when the voter is put to the alternative of opening his ticket to the view of clamorous bystanders at the polls, to prove that its contents are what its color indicates, or else be subjected to the ignominy which the previous threats of his race assure him he will meet, he cannot be said to waive the privilege, but surrenders it under compulsion.

The systematic plan of coercion which the circuit judge found was prevalent before the election, although inimical to the intelligent administration of a republican form of government, does not, as we have seen, avoid the result, because the voters, if undisturbed at the polls, could exercise their freedom of choice without detection and consequently without incurring the penalty which, the evidence shows, attached to independent voting. But when there is no escape from incurring the penalty save by exposure of the ballot, the election ceases to be free within the meaning of the constitutional guaranty.

It is not necessary to show that a majority were actually prevented from voting, or voted against their wishes, by reason of the practice. When the wrong is flagrant and its influence diffusive, it is sufficient that it renders the result doubtful. There is no division, I think, in the authorities upon that proposition. As was said by the court in *Patton v. Coates*, 41 Ark., *supra:* ''There is a distinction, in the nature of things, between particular illegal votes which may be proven and exactly computed, and which ought to be excluded wherever cast, and the effects of fraudulent combinations, coercion and intimidation. It can never be precisely estimated how far the latter extend. Fraud is secret and timidity shrinks from observation. Their effects depend on moral perversions, nervous organizations and constitutional idiosyncracies. They can not be arithmetically computed. Awe is silent and undemonstrative. Peace may be abject, as well as the result of satisfaction. Yet it cannot be said that elections are 'free and equal' where * * * fear deters from the exercise of free will, although there may be no turbulence. It would be to encourage such things, as the ordinary machinery of political contests, to hold that they shall only avoid to the extent their influence can be computed. It seems clear that courts must abnegate the power of preserving the freedom of elections, and abandon the polls to the violent and unscrupulous; or must take the ground, that wherever such practices or influences are shown to have prevailed, not slightly and in individual cases, but generally, and to the extent of rendering the result uncertain, the whole poll must be held for naught. The evils of an occasional success of a minority, if that should sometimes happen in the effort to sustain the fundamental principle of our government, would be but temporary; and in any case would be but slight, in comparison with the subversion of free government, which would surely follow the continued practice of rendering the freedom of elections a mockery.''

It is a serious thing to cast out the votes of innocent elec-tors for acts done by others, and it is the province of the courts to see that every legal vote cast is counted, when the possibility exists. *Dixon v. Orr*, 49 Ark., *supra*. But the rule obtains in elections, as in other affairs, that a man shall not profit by his own wrong, nor by that of others done to allow him to reap the benefit. The only means by which approximate justice may be reached, when the illegal acts render the result doubtful, is to require the party, to whose benefit they inure, to purge the poll of their effect, or suffer the penalty of having its majority excluded from the count of his votes.

6. Doubtful election—Purging the poll.

The circuit judge has found that a state of facts existed which, upon the application of these rules, avoids the election of the contestant. He has not specified the townships by name, but the effect which the law gives to his general find-ing is to exclude all to which the evidence shows the state of facts applies. Turning to the testimony, we find evidence from which the court was warranted in applying the rule at least to the precincts of Eagle, Eastman and Young; a like ruling might have applied to Ashley township, but the result in that precinct was not proved nor counted. Discarding these townships and counting the others, it leaves the contes-tant without a majority of the legal votes.

It is urged that the practice of casting open ballots was resorted to only for the purpose of preventing the repetition of frauds upon the ballot which had been perpetrated by the officers of election on former occasions. The trial judge found that that was not the only object, but that it was designed also to serve the illegal purpose of coercing voters. The judges of election seem to have been of different politics, and that is some guaranty of fairness; but whatever the reasona-bleness of the apprehension may have been, it is not for the courts to say that one violation of the rights of the voter justifies another. No course which in itself violates the law and tends to prevent a free election, can be justified.

It was proved that the ballot boxes and the election returns were deposited in the county clerk's safe, and that before there could be a canvass by the board, the safe was blown open by burglars and a part of the returns showing a majority for contestant were carried away, leaving an apparent majority for Glidewell, upon which he obtained the certificate of office. It is argued, that if the contestant must bear the burden of the wrong done by his constituents, the contestee should not be allowed to derive an advantage from the burglary. It is sufficient for us to answer that the only question we can settle in this case is the right of the contestant to the office. The burglary gives him no title. He can recover the office only upon the strength of his right, not upon the weakness of his adversary's. What the legal attitude of the latter would be if he (although personally innocent) invoked the aid of a court to put him into office upon a *prima facie* title based only upon a crime, will be decided when the case arises. The circuit court did not permit the burglary to injure the contestant upon the trial, for he easily proved by secondary evidence the contents of the election returns, and thereby established his cause as surely as though the returns had been present in their integrity. Thereafter the contestee assumed the burden of showing that the returns were in fact false in that they did not voice the sentiment of a free election.

It is said in argument that the circuit judge erred as to the burden of proof; but how and in what regard counsel have not pointed out. He tried the case with the decision of *Patton v. Coates* before him, and the rule is there so clearly laid down, it is difficult to understand how any misapprehension could arise as to its application in this case. We take it there was none, or counsel would have brought it to our attention.

The appellant contends that he was deprived of a fair trial because he was compelled to close his case at a time when "he

offered to introduce other witnesses who were in attendance.'' 7. Discretion of the court in the examination of witnesses.
During the progress of the trial it became necessary for the court
to adjourn in order to hold a special adjourned term in another
county in the circuit, which would be closely followed by the
regular term in still another county, which would have legally
ended the proceedings already had, and required the parties
to retrace their steps at a subsequent term of the court where
the cause was pending.    To avoid this the court permitted
the parties to agree that the cause should be taken up at the
point where it was left off, at a special adjourned term after
the lapse of the regular term.    At the time of making this
arrangement, the court gave notice that the special term
could legally last only two weeks, and notified counsel that
if they desired a decision of the case at the special term, the
time for the further examination of witnesses must be limited
to one week.    ''Counsel for the contestant,'' says the record,
''expressed a decided opinion for having the case decided
during the proposed adjourned session, and remarked that he
thought they could finish their testimony in two days after
the contestee closed, if, he added, the other side does not
take up too much of the time in cross-examination.''    The
court thereupon gave notice that the contestee would be al-
lowed four days and the contestant two in the first week of
the adjourned term.    When the time arrived the contestee
was accorded his allotted time, and on the second day of the
contestant's allotted time, which was Saturday, the court
adjourned at 1 P. M. ; but, to compensate him for the loss of
the remaining judicial hours of that day, gave him the entire
day until 6:30 P. M. on the following Monday, when, in ac-
cordance with his previous notice, the trial was closed.

   This course of conduct does not indicate abuse of judicial
discretion in the regulation of the trial.    The time was limited
in accordance with the wish of the contestant, and was ex-
tended beyond the limit for his benefit.    There is no effort
to show that unnecessary time was consumed in the cross-

examination of his witnesses, and no surprise by the court's action is claimed. Moreover, it is not shown to what points the testimony of the witnesses was to be directed. Whether it was material or would have tended to affect the result, counsel have made no effort to establish.

Limiting the time for the examination of witnesses, the number of witnesses to a given point, stopping repetitions and irrelevant examinations, are matters necessarily confided to a trial judge. Business could not well be dispatched without it. Thompson, Trials, secs. 352-3. It is only when the complaining party shows that this discretion has been abused that we interfere. It is not shown in this case. Finding no error in the record, the judgment is affirmed.

BATTLE, SANDELS and HEMINGWAY, JJ., concur; HUGHES, J., having been of counsel for parties claiming under the same election, did not participate.