RHODES *v.* DRIVER.

LOVEWELL *v.* BOWEN.

Opinion delivered July 13, 1901.

1. ELECTIONS—INDORSING BALLOTS.—In counting the ballots cast at an election those ballots on which the initials of one of the judges were indorsed by another judge should be rejected, under Sand. & H. Dig., §§ 2650, 2653, providing that "before delivering a ballot to an elector at least one of the judges shall write his name or initials on the back thereof," and that "no ballot shall be received from any elector or deposited in the ballot box which does not have the name or initials of at least one of the judges indorsed on it." (Page 504.)

2. INVALID RETURNS—PAROL EVIDENCE OF VOTES CAST.—Although the failure of the election officers to perform their duty in indorsing the ballots would not deprive the electors of their right to have their votes counted, yet, where the evidence does not show how many ballots were not indorsed properly, it would destroy the integrity of the returns, and call for proof as to how the electors voted. (Page 508.)

3. WHEN RETURNS INVALID.—In a township election persons were permitted to vote who had not paid their poll taxes, votes of two persons known to one of the judges to be dead were received, twelve were recorded as voting who swear they did not vote, four were recorded as voting who were not in the township, sixteen recorded as voting could not be found in the township,—and all the above votes were cast for contestees. The officers of election were strong partisans of contestees. There was evidence that the original poll lists were destroyed and others substituted. Before the count of votes was completed, one of the judges told how many votes were cast for contestees, and said: "That's all they got, and all we are going to give them." *Held*, that the returns from such township should be thrown out. (Page 508.)

4. FRAUDULENT AND IRREGULAR VOTES—PURGING THE POLLS.—When it is necessary to cast out the vote of a township for irregular or fraudulent votes, those who voted legally at the election may show by other proof than the returns how their votes were cast. (Page 510.)

Appeal from Mississippi Circuit Court.

FELIX G. TAYLOR, Judge.

*S. S. Semmes* and *G. W. Thomason*, for appellants.

The court should have made appellees confine their proof to the allegations and responses. 32 Ark. 553. The fraud shown to have taken place in Fletcher township, in the absence of any attempt by contestees to purge the ballot, made it necessary to throw out the returns from that precinct. 41 Ark. 123; 61 Ark. 247; McCrary, Elections, §§ 534-7; 10 Am. & Eng. Enc. Law, 774, 5. A poll tax receipt, to entitle the holder to vote, should be issued between the first Monday in January and the Saturday preceding the first Monday in July. Acts 1895, 55; Const. 1874, Amdt. 2. And the tax must be paid within that time. 10 Am. & Eng. Enc. Law (2d Ed.), 594-5. The count of ballots in Fletcher township was fraudulent, and must be rejected. McCrary, Elections, §§ 569-571.

*Rose & Coleman*, for appellants also.

Fraud may be shown by circumstances in such cases as this. 6 Am. & Eng. Enc. Law, 354; 27 Ind. 206. The return of votes from men who have not paid their poll tax was a fraud by the election judges, and vitiates their return. 1 Brewst. 52; *id.* 107. *Cf.* 41 Ark. 111. The fraud in counting ballots of men who were dead, and who had not voted, is a further ground for rejection of the returns

from Fletcher township.    61 Miss. 664; 11 Kan. 308.    The fact that the "voters" counted by the judges in Fletcher township could not be found when subpœnas were issued for them is strong proof of their non-existence.    40 Kan. 717; 9 Mont. 604; 55 N. Y. 534. The evidence shows also that more votes were cast for appellants than were counted in Fletcher township.    This is a fraud sufficient to vitiate the return.    6 Am. & Eng. Enc. Law, 355; 3 Cong. Election Cas. 62; 6 *id.* 177    The requirement of the statute (Sand. & H. Dig., § 2653) that every ballot "have the name or initials of at least one of the judges indorsed on the back of it" is mandatory; and the act of indorsing the ballots is personal, and cannot be delegated.    183 Ill. 193; 81 N. W. 805; 59 Neb. 128; 81 N. W. 313; 9 Mont. 608; Paine, Elections, § 592.    The return from Fletcher township is not evidence of the vote cast, since it was fraudulent and irregular.    McCrary, Elections, § 539; 9 Mont. 611; 26 Oh. St. 558; McCrary, Elections, 476; Smith, Election Cas., 102; 55 N. Y. 536; 63 Ill. 418; 1 Brewst. 60.

*W. J. Driver, L. P. Berry* and *Norton & Prewett,* for appellees.

Where the evidence is conflicting, this court will not disturb the findings of a judge on questions of fact.    53 Ark. 161; 50 Ark. 308; *id.* 85; *id.* 275; 41 Ark. 111; 31 Ark. 476; 61 Ark. 247; 60 Ark. 250.    The ballot is the best evidence of how the voter voted, particularly where he marks his own ballot.    31 Ark. 207.    Illegal votes do not affect the result of an election, unless it appears that they were cast and counted.    54 Ark. 409.    It was not necessary that two of the judges should take part in the mere manual labor of writing the ballot.    61 Ark. 247; Sand. & H. Dig., § 2652. Contestees were entitled to show frauds by contestants.    32 Ark. 553; McCrary, Elections, § 544.

WOOD, J.    At the general election on the 3d day of September 1900, in Mississippi county, J. W. Rhodes was a candidate for circuit clerk, and John A. Lovewell was a candidate for sheriff, on what was called the "Independent Ticket."    C. S. Driver was a candidate for circuit clerk, and Sam Bowen for sheriff on the Democratic ticket.    The general election returns showed that Driver received for clerk 910 votes, and that Rhodes received 812; that Bowen received 874 votes for sheriff, and Lovewell received 841. Driver and Bowen were accordingly declared elected to the offices, respectively, of circuit clerk and sheriff of Mississippi county, and

were duly commissioned as such. On the 18th day of September, 1900, Rhodes gave notice to Driver that at the October term of the county court of Mississippi county, following, he would contest his election as clerk. Lovewell gave notice likewise to Bowen that he would contest his election for sheriff. The cases were tried in the county court, and the decision was in favor of the contestants, and on appeal to the circuit court the decision was in favor of the contestees, and the contestants are here, asking a reversal of that judgment.

The notices of contest, as a preliminary and predicate for the charge of fraud, allege that all of the officers of election of Fletcher township were strong partisans of the contestees, and charged generally that, in conducting the election, the officers permitted and committed so many "gross irregularities, violations of the election laws, frauds and corruptions" that "the returns of said election from said township *are of so uncertain and untrustworthy a nature, in ascertaining and arriving at the true and correct vote of said township, that the entire vote of said township should be cast aside and thrown out."* The notices then specifically charge that persons were permitted to vote who had no poll-tax receipts; that the poll lists contained the names of persons as having voted who did not vote; that some 60 persons voted for Rhodes for clerk in Fletcher township, when the returns only gave him 22 votes, and gave Driver 232; that 79 persons voted for Lovewell, when the returns only gave him 25 votes, and gave Bowen 235; that the votes were taken away from the contestants, respectively, either in fraudulently marking the tickets for contestees, when the voters had directed them to be marked for contestants, or in fraudulently counting them for contestees; that only one judge was present and assisted in marking these ballots; that, after the time had expired by law for issuing poll-tax receipts for the year 1899, some 250 poll-tax receipts had been issued by the contestee, Bowen, who at the time was collector of the county, a large number of the holders of which poll-tax receipts voted for the contestees.

One of the judges of election testified: "I think, when we started out in the morning, we got it sort of mixed. All of us were putting our initials on the tickets, and I suggested that only one judge put his initials on, and they said, 'You just do that,' and along during the day some one would be making out his ticket, and I would be assisting him, and another man would come in to vote while I was busy with the first voter, and the other judges would

number his ticket and put my initials on it; but I numbered, and put my initials on, most of the tickets." The statute provides: "Before delivering a ballot to an elector, at least one of the judges shall write his name or initials on the back thereof." Section 2650, Sand. & H. Dig. "No ballot shall be received from any elector or deposited in the ballot box which does not have the name or initials of at least one of the judges indorsed on the back of it." Section 2653, Sand. & H. Dig.

Illinois has the Australian ballot law, which provides that "one of the judges shall give the voter one, and only one, ballot, on the back of which such judge shall indorse his initials in such manner that they may be seen when the ballot is properly folded," etc., and "no ballot without the official indorsement shall be allowed to be deposited in the ballot box, and none but ballots provided in accordance with the provisions of this act shall be counted." Sections 22 and 26, Laws of Illinois, 1891. In the recent case of *Kelley* v. *Adams,* 183 Ill. 193, one of the ballots was not indorsed on the back of the initial of either judge of the election. The supreme court, in holding the ballot bad, said:" The evidence shows that this ballot had no indorsement to show that it was an official ballot, provided in accordance with the law. To ignore this provision of the statute, and allow ballots to be counted which do not contain the official indorsement, would authorize the voting of ballots that might have been surreptitiously obtained or copied, and one of the purposes of the ballot law be entirely frittered away, and the door opened for fraud."

Nebraska has a similar statute, providing that upon the ballots "two of the judges shall first write their names in ink," and "no judge of election shall deposit in any ballot box any ballot unless the same is identified by the signature of two of the judges," etc., and that in the canvass of the votes any ballot which is not indorsed as provided in the act by the signature of two judges upon the back thereof shall be void, and shall not be counted." In *Orr* v. *Bailey,* 59 Neb. 128, 80 N. W. 495, the name of only one judge was indorsed. The supreme court of Nebraska, in holding such ballots void, quoted Judge McCrary as follows: "Such statutes are intended to prevent fraudulent voting, and, if the legislature is of the opinion that the general good to be derived from their enforcement will more than counteract the evil resulting from the occasional throwing out of votes honestly cast, the courts

cannot consider the mere question of policy." McCrary, Elections, § 226.

A statute of Indiana required the polling clerks to write their initials in ink on the lower left hand corner of the ballot, etc., and provided that "in the canvass of the votes any ballot which is not indorsed with the initials of the poll clerks, as provided in this act, shall be void and not counted." The supreme court of Indiana, in *Parvin* v. *Wimbery,* said: "Of course, so much of the statute as requires the ballots to be indorsed with the initials of the poll clerks is mandatory." 130 Ind. 561, 571.

A statute of Missouri provides: "It shall be the duty of judges to cause to be placed on each ballot the number corresponding with the number of the voter offering the same, and no ballot not numbered shall be counted." The supreme court of Missouri, in holding this statute mandatory, said: "In the statute now under consideration, the legislature has not only by the statute directed what shall be done, but has also declared what consequence shall follow disobedience." And, continuing, said: "This case may be a hard case, and doubtless is; but the legislative enactment is clear, and, although it may deprive a portion of the citizens of the county of their right to be heard in the election of a clerk at one election, it is better that they should suffer this temporary privation than that the courts should habituate themselves to disregard or ignore the plain law of the land in order to provide for hard cases." *West* v. *Ross,* 53 Mo. 350; *Ledbetter* v. *Hall,* 62 Mo. 422. Judge McCrary, in speaking of the Missouri decisions and statutes, says: "Although this doctrine may sometimes result in very great hardship and injustice by depriving the voters of their rights by reason of the negligence or misconduct of the officers of election, it is nevertheless difficult to see how any different construction could have been placed upon such a statute. * * * Where the statute both gives the directions and declares what the consequences of neglecting their observance shall be, there is no room for construction." McCrary, Elections, § 226. So much for the law.

But it might be contended, first, that the initials of one of the judges were indorsed upon the ballot; and, second, that there is no provision in our statute inhibiting the counting of the ballots so indorsed, or declaring them void, and hence the authorities cited *supra* have no application. Taking the two sections of our statute together, it is clear that by the first the legislature intended to provide for the indorsement, and how it should be made. There is a

well-settled rule of law that where a statute simply provides that certain things shall be done within a particular time or in a particular manner, and does not declare that their performance shall be essential to the validity of an election, they will be regarded as mandatory if they affect the merits of the election, or as directory only if they do not affect it. McCrary, Elections, § 225. *Barnes v. Board of Supervisors,* 51 Miss. 305. Under this rule, if the above first section stood alone, it might possibly be held only directory. But when we take the other in connection with it and in connection with all the other sections, as we must in getting at the purpose of the legislature, we cannot escape the conclusion that these provisions were intended to be mandatory. For the other section above quoted virtually declares what the result of a failure to indorse the ballot is by saying that no ballot shall be received from any elector or deposited in the ballot box which does not have the name or initials of one of the judges indorsed on it. How indorsed? Of course in the manner provided in the other section, *i. e.,* by the judge himself. The language of our statute, "no ballot shall be received or deposited in the ballot box," though using fewer words, conveys the same idea, and was intended to subserve the same purpose, as that of the statutes of the several states quoted. That purpose was to provide an effectual means for the identification of each particular ballot; that, too, by living witnesses, if possible, and the particular ones upon whom the law put the duty and the responsibility. There is good reason why the judge should be required to indorse his own name. Then he can swear to his own signature, and, if he be dead, or out of reach, in case of contest, and the ballot be called in question, other witnesses can be called to identify his signature. But if each judge indorses the other's initials and not his own, then there are no indorsements as the law provides, and no witnesses of identification to the actual signature, and the very purpose of the law—to prevent spurious ballots, to prevent conspiracies and combinations among the judges themselves, to make each a check upon the other,—is frustrated. The statute requires that each judge shall be able to read and write. Then why should any judge write another man's initials in preference to his own? Ordinarily, it would be supposed that he could write his own easier and better than that of another, and why should there be any arrangement that the initials of only one judge should be indorsed upon the ballot, no matter what judge furnished the ballot? If the stat-

utory mode is not pursued, then there can be no compliance with the provision at all. It is a dead letter. For, if one judge could write the other judge's name, in departure from the statutory requirement, why not the sheriff, or his deputy or any one of the clerks do the same? The rule of *facit per alium facit per se* does not apply to election officers. Each must perform his own duty, and in default answer for his own derelictions, for which, in most instances, ample penalty is provided. While this failure of the election officers to perform their duty could not deprive the electors of their constitutional rights to have their votes counted (sec. 11, art. 3, Const; *Govan* v. *Jackson*, 32 Ark. 553), it would, and does, where the evidence does not show how many of the ballots were illegally indorsed, destroy the integrity of the returns, and call for the proof as to how the voters voted.

There is no proof in this record as to how many ballots were not indorsed as the statute requires. This, however, if the ballots be still preserved, can easily be shown.

We will not enter upon a discussion of the evidence bearing upon the various other charges of irregularity and fraud. The proof showed that a considerable number of persons voted who had not paid their poll tax. This is shown by a comparison of the poll lists with the official list of voters furnished the judges of election and evidence of witnesses upon the subject. The number, however, is not near so large as that claimed by contestants, but too large to be consistent with that strict vigilance which the law requires of election judges in order to prevent illegal voting.

The proof shows that there were two votes in the names of men who had been dead for sometime; that these dead men were known in their lifetime by one of the judges of election; that there were not known to be any other men by the same name in the township. The proof tends to show that some eighteen persons were put upon the poll lists in Fletcher township as having voted who did not in fact vote. Concerning twelve of these it might be said that the evidence was conflicting; they swearing that they did not vote, while the returns, and the testimony of the judges of election as to their regularity, were to the contrary. Concerning the two dead men there could be no mistake, and as to the four claimed to be absent from the township the testimony is reasonably certain. The most singular fact about all these alleged illegal votes is that not one of them was returned as having been cast for contestants. It is not impossible, to be sure, for such a thing to occur; but the

fact that it does occur with so large number of votes in any contest case is a most cogent circumstance to be considered as tending to establish the charge of fraud. The proof shows that sixteen names were upon the poll books returned as having voted for appellees, for whom subpœnas issued but who could not be found in the township. This was a mere circumstance to be considered, in connection with all the evidence, as tending to show that parties might have been returned as voting who were not in the township. Of itself, it would amount to but little. There was evidence tending strongly to show that the poll lists made by the clerks on the day of election might have been destroyed or abstracted, and new ones substituted. Lentz, one of the clerks, testified that he was unable to identify either of the poll lists of Fletcher township as being his handwriting, because of the fact that he writes so many different ways; knew that he made one of the lists that was kept during the election, but cannot say that either of the lists shown him was written by him.

L. B. Hart testified: Was one of the clerks of election in Fletcher township. Says one of the poll lists shown him was in his handwriting; that the other one was written by Mr. Lentz. Witness writes a little heavier than Lentz. Tried to write like Lentz that day, as he was in front of him, just to see if he could, and did it very effectually. Question. "You say you were sitting at the table with the judges of election; a man would come in there and vote, and give his name, the judges would call it out, and you were there, looking over Mr. Lentz's shoulder, and trying to ape him in copying his handwriting, in writing out that list?" Answer. "Yes, sir." Question. "That is the reason for the similarity?" Answer. "Yes, sir." Witness writes samples of his handwriting, which are attached to the poll lists by the court. So far as the testimony of Hart is concerned, it is enough (and bad enough) to say that the original poll lists, identified by him as having been made by him, and specimens of his handwriting brought into this record show conclusively, even at a glance, that they could not have been made by the same person. We are of the opinion that it would be impossible for one writing as Hart is shown by the original specimens to write to so disguise his handwriting as to have ever produced the handwriting as it appears upon the poll lists which he says he wrote. The testimony of this witness shows that, for some purpose, there must have been tampering with the poll lists. The testimony of the witness Lentz,

to say the least, was peculiar. It rarely occurs that a man would fail to recognize his own handwriting, although he might at times write in different ways. When a man fails to identify a writing as his own, it is not unreasonable at all to conclude that the reason for his so doing is not from lack of memory or power of identifying that which he produced, but because it was the writing of another.

There was proof that the officers of the election in Fletcher township were strong partisans of the contestees. This alone would amount to nothing. Every man who votes is, in a certain sense, a partisan; but it was proper to show it as a predicate for the proof of fraud or irregularity.

One of the judges of the election, while the count was being made, and before it was concluded, upon being asked how the vote stood, told how many there were for Rhodes and how many there were for Lovewell, and, upon being asked how the vote was for the others, replied: "They were not through counting yet." Upon then being asked how he knew what was the vote of Rhodes and Lovewell, replied, "That's all they got, and all we are going to give them." Explained as it was by the judge himself and others, we are inclined to think there was no more of gist than jest, perhaps, in this remark of the judge of the election. Still, it was a circumstance entirely proper to be shown.

For authorities on all these points, see brief of counsel for appellants.

Upon the whole, we are of the opinion that the conduct of the officers of election in Fletcher township was such as to make the returns from that township entirely unreliable. Unless the candidates themselves be honest in the first place, and the voters in the second place, and the officers of election in the third place, it is, of course, impossible to have any honest elections. But the object of our Australian ballot law was to compass, as far as possible, this desirable end. That it is the best plan which human ingenuity has yet been able to devise to leave the voter untrammelled in the exercise of his sovereign will at the polls, and to ascertain and enforce that will, is attested by the numerous states which have adopted its main features in their election laws. But, if such flagrant indifference to some of its admirable provisions as is shown in the conduct of the election of Fletcher township be tolerated, it will but encourage a repetition of like practices in the future, and bring unmerited reproach upon the law itself. The election returns from Fletcher township being thus discredited, in the

absence of any proof showing how each and every qualified elector voted, it is impossible to purge the ballots of that township here. The contestees, if they depend upon the vote in that township, would have to show by proof, other than the returns themselves, as to how the votes were cast. We believe they should yet have this privilege. It was contended by the contestees that many votes received by contestants in other townships were by persons whose poll tax had been paid by some one else, without being first requested so to do by the voter, and without any expectation or promise of reimbursement, thus bringing them within the doctrine announced in the recent case of *Whittaker* v. *Watson*, 68 Ark. 555. Also other illegal votes were claimed to have been cast for contestants. The contestees have shown that several hundred electors of Mississippi county had their poll tax paid by others, and that they were not qualified voters. But they have only shown that about 116 of these voted, and these are all that we could consider in the count. The proof shows that of these Rhodes received 107, while Driver received 9, and that Lovewell received 106, while Bowen received 8. So that, if the result of the election depended upon the other townships, with Fletcher excluded, the contestants would be elected.

We are not satisfied from this record as to who was really elected clerk and sheriff, respectively, in Mississippi county. Therefore we think a new trial should be had, and additional proof taken, if desired.

For the error in not discrediting and disregarding the returns of Fletcher township, the cause is reversed and remanded for a new trial, with directions to the circuit court to allow the parties litigant to take additional proof, if they so desire, and to proceed in a manner not inconsistent with this opinion.

BUNN, C. J., (dissenting). These are election contest cases for the offices of sheriff and clerk of Mississippi county, growing out of the general election of September 3, 1900, and both, being upon the same pleadings and the same evidence, substantially, only differing in some minor details, are both heard together.

The contestants narrow their allegations of contest down to Fletcher township only, while the contestees filed responsive allegations, but nevertheless took testimony showing fraudulent votes cast in favor of the contestants in the other townships than Fletcher, to the extent of 114 votes for sheriff and 116 for clerk, and of these

there were received and counted for Lovewell 106 and for Bowen 8, which leaves 96 to be deducted from Lovewell's majority of 177, received otherwise in these townships, making his majority only 81 instead of 177. And in the clerk's election making the 112 majority of Rhodes only 14. If Fletcher township is to be thrown out, as held by the court, both contestants are elected,— Lovewell by a majority of 81, and Rhodes by a majority of 14.

I do not think the circumstances justify the annulment and consequent throwing out of the entire vote of Fletcher township, because I find from the pleadings and the evidence adduced by the contestants, without considering the counterproof of the contestees, that the true vote cast in that township can be ascertained with reasonable certainty—at least approximately, which is all that can be required in a contested election, when all the evidence is derived from the bias of partisanship.

Voters whose votes are not challenged, and against whom there is no charge of fraud, or complicity therein, or of irregularities, ought to have their votes counted, if practicable, notwithstanding the fraudulent conduct of others, and thus be allowed a participation in the election of their county officers; and this right does not admit of carrying latitudinous and merely theoretical rules beyond the necessity which called them into action.

In McCrary, Elections, § 523, the author says: "The question, under what circumstances the entire poll of an election division may be rejected, has been much discussed, and conflicting views have been expressed by the courts. The power to reject an entire poll is certainly a dangerous power, and, though it belongs to whatever tribunal has jurisdiction to pass upon the merits of a contested election case, it should be exercised only in an extreme case, that is to say, a case where it is impossible to ascertain with reasonable certainty the true vote."

The true vote in this case, in my opinion, is easily determined in that township, without resorting to the dernier ressort of throwing out the returns and the whole polls. And thus the true vote can approximately be determined, if not with mathematical certainty, which can seldom be ascertained in such cases.

The contention of contestants is that 110 fraudulent votes were cast in Fletcher township that should not have been cast for any one. The returns show by name that 271 votes were cast. This leaves 161 legal votes cast. There were no votes cast except for the candidates named as parties in this contest. Contestant

Lovewell claims, and he shows by proof which he had to make, that he received 40 of these. This leaves 121 for Bowen, making a majority in that township for Bowen of 81 votes, which would leave Lovewell in the whole county a tie vote or at most a bare majority of one. By the same calculation, Driver would have a majority of 65 or 64 in the whole county.

I think the judgment should have been affirmed; but since the case has been remanded on reversal, I do not dissent from this disposition of it, for I think the contestants, or at least one of them, is not elected, by any kind of concession of facts to them.