SIMS *v.* HOLMES.

4-4208

Opinion delivered December 16, 1935.

*Dennis W. Horton* and *Roy D. Campbell,* for appellant.

*W. A. Leach,* for appellee.

McHANEY, J.   Appellant and appellee were opposing candidates for nomination for the office of county and probate judge of Prairie County in the Democratic Primary Election held on August 14, 1934.   Appellee was certified by the county central committee to be the winner, he having received on the face of the returns as cast up and certified 1,966 votes, whereas appellant was shown to have received only 1,693 votes, or a majority of 273 in appellee's favor.

Appellant contested appellee's right to the certificate of nomination in apt time, alleging many irregularities and actual fraudulent conduct on the part of the election officials, and challenged many ballots as having been cast for appellee illegally.   Appellee responded, denying all material allegations of the complaint and making specific challenges of illegal votes having been cast for appellant.   Both parties filed pertinent amendments to their pleadings from time to time by permission of the court, alleging additional challenges of votes claimed to be illegal, until, as said by appellant, "a greater portion of the votes cast in the election had been challenged by one side or the other in this proceeding." The original complaint challenged the entire voting precinct of White River township for fraud and misconduct on the part of the election officials, and, after the proof had been taken, this allegation was enlarged to include Belcher township.   Early in the trial of the case motions were made to exclude the entire vote in these townships, and also all ballots cast by persons who voted upon poll tax receipts issued after June 15, 1934.   It was shown that approximately 1,200 poll tax receipts were issued after said date under facts and circumstances that indicate very strongly that they were paid for after said date, and were issued at the request of appellee and his friends and supporters to such persons as would vote for him. The deputy tax collector who issued these receipts after said date testified they were paid for prior thereto, and that he had not had time to issue them.   Be that as it

may, we find it unnecessary to discuss or decide this question. The court overruled the motion to throw out the entire vote of said townships, and this is the first and major point argued for a reversal on this appeal.

As stated above, the vote as certified was 1,966 for appellee and 1,693 for appellant. After 14 months of arduous, painstaking work on the part of court and counsel, on October 24, 1935, judgment was entered finding that a great many illegal votes had been cast for each party, of which appellee had received 922 and appellant 661, and, after deducting these illegal votes each had received from the totals as certified, the result was appellee 1,044 and appellant 1,032, or a majority for appellee of 12 votes. In arriving at this result the court refused to disregard or throw out Belcher and White River townships, as also Upper and Lower Hill townships, which latter had been added to his former motion by appellant. Now, with reference to the vote in these townships, the court found as follows:

|  | Certified Votes | | Illegal Votes | | Legal Votes | |
|---|---|---|---|---|---|---|
|  | Holmes | Sims | Holmes | Sims | Holmes | Sims |
| Belcher | 160 | 22 | 80 | 5 | 80 | 17 |
| White River | 661 | 158 | 295 | 63 | 366 | 95 |
| Lower Hill | 3 | 161 | 2 | 122 | 1 | 39 |
| Upper Hill | 0 | 16 | 0 | 11 | 0 | 5 |
| Totals | 824 | 357 | 377 | 201 | 447 | 156 |

It is not disputed in this record that all the votes held to be illegal by the court were in fact so. In fact it seems to be conceded by both sides. The staggering result is that, out of a total of 1,181 votes cast in these four townships, a total of 578 votes were illegal and void, nearly one-half of them. The same ratio, or approximately so, prevailed throughout the county. Out of a total of 3,659 votes cast for county judge, 1,583 votes were held illegal. On a percentage basis 48.8 per cent. of the votes in the four townships were illegal, whereas 43 per cent. of the votes in the whole county were illegal. What was the trouble? What was the reason for this high percentage of illegality?

As to Belcher township, the proof is undisputed that 33 persons whose ballots were found in the ballot box,

listed on the poll books, numbered and counted were not at the polls on election day, and did not vote at all, not even by proxy. It is also shown by the judges of election themselves in this township that in some instances husbands were permitted to vote for their absent wives. In other words, the wives voted by proxy. The proof does not show just how often this occurred, but the poll books or register of voters shows they so voted in pairs in 14 instances. It is also shown that ballots were taken out to people who did not attend the election and were brought back and voted in the names of the absentee. Two persons who lived at Stuttgart and four who lived at Lonoke were permitted to vote. A number of persons testified that they did not attend the polls, nor pay any poll tax, but that a ballot was brought to them and a poll tax receipt given them, and that they marked the ballot, or had it done, and the ballot was later found in the box and voter listed on the poll books. Many of such persons so voting lived miles away from the polling place. One of the judges testified it was the custom in that township, when people did not come to the polls, to send out ballots to them, and that he did not know how many long distance voters of this kind they had. Also a 17-year-old married woman was permitted to vote. All such ballots were cast for appellee, the judges and clerks being his partisans.

As to White River Township, about the same course was pursued. Ballots of 29 persons who did not attend were found in the box, three ladies who did not vote were found to have voted twice, and one ballot was cast that had no name for it on the register. A girl 18 and a boy 17 years old, and two persons who lived in White County were permitted to vote. It is also shown that husbands were allowed to vote for their absent wives in some instances, just how many is not shown, but 55 couples so voted in pairs, and many others were held illegal. In some instances, persons to whom ballots and poll tax receipts were brought refused to vote, yet their ballots were found in the box and their names on the register as having voted. One 18-year-old boy was permitted to vote provided he voted for appellee. The judges, all of

whom were partisans of appellee, admitted that persons were permitted to vote who were not present which was the custom there, and one of the judges took at least 20 ballots out and got people to vote them, brought them back, and put them in the box after the polls were closed. All such votes were counted for appellee. Ballots were in the possession of others than the judges, who were out rounding up votes for appellee. Numerous other irregularities were shown, but those enumerated are sufficient to show a new and unique method of holding a primary election. Such conduct on the part of the election officials, is, in our opinion, so reprehensible and fraudulent as to impugn and destroy the integrity of the whole vote cast in said townships. Under similar circumstances the vote in a township was disregarded in *Rhodes* v. *Driver,* 69 Ark. 501, 64 S. W. 272.

In *Freeman* v. *Lazarus,* 61 Ark. 247, 32 S. W. 680, Judge RIDDICK quoted from McCrary on Elections, § 539, the following: "There is a difference between fraud committed by officers, or with their knowledge and connivance, and a fraud committed by other persons, in this: the former is ordinarily fatal to the return, while the latter is not fatal, unless it appear that it rendered doubtful or changed the result. If an officer is detected in a willful and deliberate fraud upon the ballot box, the better opinion is that this will destroy the integrity of his official acts, even though the fraud discovered is not of itself sufficient to affect the result. The reason of the rule is that an officer who betrays his trust in one instance is shown to be capable of defrauding the electors, and his certificate is good for nothing." *Patton* v. *Coates,* 41 Ark. 113, and *Jones* v. *Glidewell,* 53 Ark. 161, 13 S. W. 723, are cited to support the quotation. In the latter case it was held that, in order to destroy the result, "it is sufficient to show that wrongs against the freedom of election have prevailed, not slightly and in individual cases, but generally and to the extent of rendering the result doubtful." In *Cain* v. *CarlLee,* 169 Ark. 887, 277 S. W. 551, it was held in a primary election contest that one vote registered in the name of a party who did not vote at such election was not sufficient to impeach the

integrity of the entire vote of the precinct. In that case one lady testified concerning the precinct of Cotton Plant that she had lived in Cotton Plant for six years, was not at the primary election and did not vote, yet her name appeared in the list of votes in the Cotton Plant box. In answer to the contention that that precinct should be thrown out, this court said: "The above is the only testimony in the entire record offered to impeach the integrity of the precincts of Augusta and Cotton Plant. The testimony is wholly insufficient for that purpose, and the trial court ruled correctly in so holding. In *Crawford* v. *Harmon*, 149 Ark. 343, under a precisely similar state of facts as that which occurred at the Augusta box, we said: 'It does not appear that this was done with any fraudulent design, but with an honest purpose on the part of the judges to permit the sick man to cast his ballot. The court properly threw out this ballot as having been illegally cast, but it afforded no ground for discarding the whole vote of the precinct.' The same may be said also as to the Cotton Plant precinct. The testimony of Mrs. Parnell is not sufficient to show any fraud upon the part of the officers conducting the election in that precinct. Fraud cannot be predicated upon the single and isolated circumstance revealed by the testimony of Mrs. Parnell that she didn't attend the election at that precinct, whereas a vote is registered in her name as No. 307. This was a large precinct, having more than 300 registered voters."

Here the situation is entirely different. Numerous persons were counted as voting, and whose ballots were found in the box with their names on the register, who did not attend the election at all. These persons had no right to vote, and the court properly excluded them as illegal. But the proof further shows in instances husbands were allowed to vote for their absent wives, and just how many of these there are is not known and cannot be known without calling all the people in the township who were registered as voting in said election. These facts, together with the other facts and circumstances heretofore set out, are sufficient to constitute fraud upon the part of the election officials which de-

stroys the integrity of the ballot in those precincts and renders it uncertain and doubtful as to who received the majority of legal votes in said election. We think the showing made by appellant was sufficient to impel the court to exclude the entire vote in said townships, and that it should have done so, unless the appellee had offered to call in all the remaining electors in said townships whose votes were not excluded as illegal to show by them that they were legal votes, and that the burden was upon appellee to do so because he was the beneficiary of such votes. Not having done so, we must declare his nomination not sustained. In such case the provisions of § 3776, Crawford & Moses' Digest, applies. This section reads as follows: "Should a proceeding under §§ 3772-3, or a criminal prosecution under § 3774, be not determined finally until after the election, and the defendant in such proceeding is elected to the office as the nominee of the party, and it is determined that he was not entitled to the nomination, or the judgment contains a finding that he violated the laws, as provided in § 3774, then such judgment shall operate as an ouster from office, and the vacancy in it shall be filled as provided by law for filling vacancies in such office in case of death or resignation."

Appellee's motion to dismiss the appeal will be overruled, the judgment of the circuit court will be reversed, that appellee be removed from the office of county and probate judge of Prairie County, and a vacancy in said office is hereby declared, to the end that such vacancy may be filled "as provided by law for filling vacancies in such office in case of death or resignation." It is so ordered.

SMITH, J., (dissenting). It was said in the case of *Taaffe* v. *Sanderson,* 173 Ark. 970, 294 S. W. 74, that: "The real object of the courts, in all election contest cases, is to determine whether the contestant or the respondent has received the highest number of legal votes." The trial court appears to have made a very painstaking effort to discharge that duty. The court found that 922 illegal votes had been cast for appellee, and that 661 illegal votes had been cast for appellant. The rotten

1040

frauds attending the election appear to have so disgusted the majority that they have washed their hands of it all, before determining whether the contestant or respondent has received the highest number of legal votes. But in their haste and disgust the majority have departed from long and well-established rules for the trial of election contests, and I am therefore constrained to register my dissent.

The law provides and requires that the result of elections shall be certified by the officers holding them. This certificate is clothed with a presumption of verity which is conclusive, until the affirmative showing is made that it is false, and the burden of so showing is, of course, upon the party asserting the falsity of the certificate. The official election returns are *quasi* records and stand until overcome by affirmative evidence against their integrity. *Schuman* v. *Sanderson*, 73 Ark. 187, 83 S. W. 940; *Powell* v. *Holman*, 50 Ark. 85, 6 S. W. 505.

In ordinary election contests opposing candidates challenge the validity of votes counted for their opponents. After deciding what ballots were illegally cast, these are then put aside, and those remaining are counted and the result is determined. The testimony is thus confined to the challenged votes. When, however, it is shown that frauds were committed, not only by the electors in voting, but the officers of the election in holding the election, the returns which they make of the election are then said to be discredited. The case of *Freeman* v. *Lazarus*, 61 Ark. 247, 32 S. W. 680, cited in the majority opinion points out the difference in the effect of fraud committed by the electors from that committed by the officers of the election.

Now, it may be conceded that the testimony set out in the majority opinion so far discredits the certificate of the election officers in the four precincts which have been thrown out as to destroy the presumption of verity which would otherwise attend the election returns. It will be observed that two of these townships were carried by appellant, and the other two by appellee. But even so, this is no reason for not counting the legal votes which were not fraudulently cast in those townships.

A motion to throw out the returns of a particular precinct is, in effect, an objection only to the competency of the returns as evidence. To sustain this motion in a proper case (as the instant case may be conceded to be), the effect thereof is to determine that the certificate of the election officers has lost its probative value. Such a ruling does not determine the legality or illegality of any particular vote. It merely decides that the certificate of the election officers to the election returns is not proof as to the number of votes cast for any candidate. The throwing out the returns of any precinct affects only the method whereby the vote of that particular precinct may be established. Each candidate has as many votes after such a ruling as he had before; but he must present other evidence to show such votes; he can no longer rely on the election returns as proof.

I do not understand that the majority question these well-established principles, as they are declared in the cases cited in the majority opinion. The majority say: ''We think the showing made by appellant was sufficient to impel the court to exclude the entire vote in said townships, and that it should have done so unless the appellee had offered to call in all the remaining electors in said townships, whose votes were not excluded as illegal to show by them that they were legal votes, and that the burden was upon the appellee to do so, because he was the beneficiary of such votes.''

It is this statement, as applied to the facts of this case, which prompts my dissent. It appears to be conceded that appellee has the majority of the legal votes, unless both Belcher and White River Townships are discarded. The returns, as certified by the election officers, gave appellee only three votes in Lower Hill Township and no votes in Upper Hill Township. Of these three votes only one was counted by the court as legal. The majority hold that the entire vote of all these townships must be discarded and disregarded because the appellee had not called in all the electors whose votes were not excluded as illegal.

Now, the trial court did not sustain the motion to throw out entirely the vote of these townships. Had

this been done, the effect thereof would have been only to hold that the returns were not competent as evidence to establish the vote cast. Each party would then have had the absolute right to show by other evidence the vote cast for himself. This right could have been exercised or declined as each party saw fit, but without other evidence the votes cast in those precincts could not have been counted; not because they were illegal, but because they had not been proved to be legal.

It is very evident that each party challenged every vote adverse to himself, which he believed to be illegal, and the court has in fact and in effect determined the number of legal votes and the candidates for whom cast, independently of the election returns. But it should in any event be kept in mind that the trial court declined to throw out the votes of these townships. There was therefore, under this ruling of the trial court, neither necessity nor opportunity for appellee to prove the vote of any elector whose vote had not been challenged. Had the trial court, at the conclusion of all the testimony, excluded these townships, either party would then have had the right to offer other evidence as to the legal votes which he had received. A denial of this right would, under the majority opinion, have been error calling for the reversal of the judgment. The majority are themselves now committing that error. It is now held, for the first time, that the votes of these townships should be thrown out. It being now decided that the trial court should have thrown out these townships, it follows that each candidate should be allowed to show the number of legal votes which he received in those townships. Evidently this is what the trial court thought he was doing and had done; but, if not so, he should be permitted and required to ascertain that fact. The trial court having held that the verity of the election returns had not been discredited, it would not have been competent or necessary for appellee to prove the legality of votes not questioned, but the court did pass upon all the votes challenged.

Had the trial court sustained the motion to throw out the votes of these townships, then, and in that event,

the necessity for other evidence would have arisen, and the opportunity to offer such evidence would of course have been afforded. This opportunity should now be afforded.

The case of *Williams* v. *Buchanan,* 86 Ark. 259, 110 S. W. 1024, defines the correct practice in accordance with the views I express. In that case the trial court had held that the fraudulent conduct of the election officers had so discredited the returns as to destroy their value as evidence. The contestant then made proof of the legal votes cast for himself; the contestee did not make this proof. Under those circumstances, only those votes shown to be legal were counted. But here, we have an entirely different case; the court in the instant case overruled the contestant's motion to throw out the townships. There was therefore no necessity for evidence other than the returns, except to prove or disprove the legality of the particular votes challenged. Yet it is held in effect by the majority that contestee should have brought before the court the 160 persons in Belcher township and the 661 persons in White River township, who had voted for him, to prove what the trial court had ruled had already been established by evidence competent and legally sufficient for that purpose.

The majority cite the case of *Rhodes* v. *Driver,* 69 Ark. 501, 64 S. W. 272, but do not follow the practice there laid down. In that case the opinion recites "that the conduct of the officers of election in Fletcher township was such as to make the returns from that township entirely unreliable." It was said therefore that if the contestee would depend upon the vote of that township he would have to show by proof other than the returns themselves how the votes were cast. In that case, as in this, the trial court had not held that the presumption of verity of the election returns had been destroyed. This court reversed that ruling, but did not order that the vote of that township be disregarded, as has been done in the instant case. On the contrary, it was held that the contestee, after that ruling had been made by this court, "should yet have this privilege" of proving the legal votes which he received in that township.

Upon identical facts the same ruling should be made here, and the trial court should be directed to hear, if he has not already heard, testimony as to the legal votes cast for each candidate; and upon such testimony to find, if he has not already found, who received the largest number of the legal votes, thus fulfilling the real purpose of the contest.