Horne v. Fish.

4-5443                                127 S. W. 2d 623

Opinion delivered April 24, 1939.

*Reinberger & Reinberger* and *E. D. Dupree, Jr.*, for appellant.

*E. W. Brockman*, for appellee.

BAKER, J. This suit was filed as a contest of the result of the primary election in 1938. The parties were opposing candidates for the office of county judge. The result of the said primary election, as certified by the

election officers, was 985 votes for Horne and 923 votes for Fish. Upon a trial of this case the court found that there were 530 illegal votes cast for Horne, 445 illegal votes cast for Fish, and Fish was declared the nominee of the party and his name was ordered placed upon the ballot as such. From the judgment of the trial court, declaring W. A. Fish the nominee, and also declaring J. M. Horne, the contestee, disqualified from holding office, this appeal has been taken. Although the record in this case is extremely voluminous, matters have been so well presented by counsel that the issues now submitted upon this appeal are comparatively few.

In order to shorten this discussion, we think it may be said that this contest has taken the usual or conventional form of such contests and that upon this appeal only the following matters are presented: (1) did contestant W. A. Fish receive the highest number of legal votes cast in the August primary? (2) was the contestee, J. M. Horne, who had been duly certified as the nominee by the committee, properly held to be ineligible to hold an office?

We approach the first one of these questions, giving due consideration to the doctrine announced in the cases of *Sweptston* v. *Barton,* 39 Ark. 549, and *Bohlinger* v. *Christian,* 189 Ark. 839, 75 S. W. 2d 230. We recognize the principle therein announced and again reassert that even though the contestee, J. M. Horne, might be held disqualified to hold the office, this fact alone would not entitle the contestant, W. A. Fish, to the nomination. Unless Fish received a majority of the legal votes cast in the primary election he could not properly have been declared the nominee, even though Horne, his sole opponent, might have been disqualified. The trial court approached the issues in this case upon that theory and there remains for our determination several questions of the proper qualifications of electors, under conditions arising from the proof in this case, which will be set out under the several subdivisions upon which the appeal has been taken.

Appellant argues as the first proposition that the duplicate ballots were inadmissible in evidence and that

the court erred in directing or ordering the opening of these ballots to determine for whom the voters had cast their ballots. This contention, by the appellant, gives us the most serious problem of all those argued upon appeal. The evidence shows that these duplicate ballots were deposited, in ballot boxes made of cardboard, about 10 x 10 x 10 inches in size. These boxes were sealed with a heavy cloth which was glued or pasted at all corners and edges and the only opening was a slot in the top, through which the ballots were inserted or pushed into the box, and at the side of this slot there was a gummed flap with which the opening was closed after the ballots had been cast. These boxes had properly been delivered to the treasurer of the county who testified that he kept them for a day or two in a vault at the courthouse and during that period he watched or guarded them because other people had access to the vault; that thereafter he moved them to his home where he placed them in an unused closet where they were locked with an ordinary rim lock. The door was also fastened by driving two nails through the edge of the door into the door casing.

It is argued most forcefully that these ballots had not been preserved and protected as provided for by § 4758 of Pope's Digest which is to the effect that the election commissioners shall provide for each precinct a good and sufficient ballot box with a lock and key. There is, also, a further provision, under § 4759, which is a part of act 123 of 1935, in regard to the duplicate ballot boxes, not strictly followed. The effect of that section is that the duplicate ballots, after they are voted, or deposited in the duplicate ballot box, be preserved by sealing with a standard make and numbered seal by the person who delivered the election supplies to the election officers and that a record be made of the number upon each seal showing to which precinct the box bearing said number was delivered. The record signed by the person sealing the ballot boxes and verified by him ought to have been filed with the county clerk as a permanent record. These requirements were not met.

As to the duty of the county treasurer, the said section provides further that these duplicate boxes should

be delivered to the county treasurer who should safely keep said ballot boxes under the same penalties prescribed therein for failure of the county clerk "to safely keep the returns received by him."

There is a most forceful argument to the effect that if these ballot boxes are not of the kind described and provided for by the law the purity and integrity of the ballots must be deemed and treated impeached and that they may not be resorted to for a determination of the number of votes cast for any candidates, but that resort must be had to the certificates of the election officers to determine such questions.

While we are unwilling to assert in the face of this record that there was a substantial compliance with the law prescribing and providing for the kind of ballot box that might be used for the deposit of the duplicate ballots, we think in this case, under the record, there was no prejudice to the rights of any party. The facts are undisputed as they have been presented on this appeal. As these ballot boxes have been described to us, they were made of cardboard, covered at all edges with a strip of cloth or tape, having only one opening, and that was the place where the ballots were inserted into the box. It will readily appear, we think, to any fair-minded person that after this one opening had been sealed with a gummed flap the ballots could not have been tampered with in any respect, unless by someone cutting into or breaking open such ballot boxes, and the force or violence sufficient to open any of the boxes must necessarily have appeared later, even upon a casual examination. It is true it might have been an easy matter to have opened any one of the boxes, but it is equally true that if the boxes had been made of tin, with lids, hasps and locks, they too might have been opened by the use of an ordinary can opener or a pocket knife. In like manner, the ordinary wooden box, so frequently used, might easily be pried open by one desiring to do so, by the use of an ordinary chisel or screw driver. Any method, however, that might have been employed to open any one of the boxes, or almost any kind of box, would have left some mark indicating that fact. We understand, of course, that a new paper box of the same kind, size and shape

might have been substituted, but the same is true about any other kind of box that might have been used. While these boxes did not have locks and keys, they were sufficiently sealed. Moreover, while they were not numbered, nor was there a record of the number filed or left in the office of the county clerk, they were positively identified by undisputed evidence by the county treasurer into whose possession they had been given as the ballot boxes delivered to him by the proper election officers and each one was in like manner identified as the duplicate ballot box of the particular voting precinct containing duplicate ballots cast in that precinct. The court was careful in hearing all of the introductory evidence prior to the opening and examination of duplicate ballots taken from the said boxes, and it is not questioned by appellant that the proof then was undisputed, that there was no evidence that the integrity of the ballots had been destroyed, or even affected, except the sole and only contention that these ballot boxes were of weak and flimsy material and construction. Admitting the full force of appellant's argument, we think it sufficient to say that it affirmatively appears here that the integrity and purity of the ballots must be deemed as unimpeached. So, giving full force to the foregoing statutes, we must hold that appellant's rights, on account of the facts established, were not in any manner prejudiced.

We do not think in this holding that we are impairing to any extent the rule announced in the case of *Powell v. Holman*, 50 Ark. 85, 6 S. W. 505. In that case it was found that after the ballots were counted, they were deposited for the night in a hall used by several civic orders and clubs, where they were locked in a wardrobe, but were left unguarded. On the next day, after the vote had been canvassed and abstracted by the clerk, the ballots were placed in a room which was an exposed and unsafe place, affording opportunity for tampering with the ballots, and they remained there for a week. The distinction in that case and in the instant case must be apparent. Here, after the ballots were placed in the vault, the treasurer, who had charge of them, guarded them as long as they remained there. This was because others had access to

the vault. Thereafter, he removed them to his home where he placed them in an unusued closet, which was not only locked, but the door was nailed. Of course, it was not impossible for someone who was determined to do so to break in and get to the ballots, but the law does not require that degree of care. It is a matter of common knowledge that even the strongest vaults are sometimes illegally broken into and entered. It is apparent, we think, that it was highly improbable, if not impossible, that any of these ballots could have been in any manner contaminated. Therefore, we must say the ruling of the court was correct. This is especially true since we think it affirmatively appears that the ballot boxes were. guarded with more than ordinary care and that it affirmatively appears further that no suspicion could arise that there was any substitution or change in any manner.

The next proposition that gives us concern is the fact that there were a great number of people who were assessed as delinquent taxpayers. It is argued that the court erred. in declaring the ballots of these delinquent voters void, for the sole reason that § 4695 of Pope's Digest had not been complied with. In this case many of those who were delinquent in the matter of assessment signed orders directing or authorizing someone else to make an assessment for them, and, in addition, they signed orders authorizing certain people to pay poll taxes for them and to receive poll tax receipts. These assessments and payments were alleged to have been made in accordance with the foregoing statutes. But this is what happened. Although there was an effort made to assess these delinquents by having them sign orders authorizing some particular person to make the assessment, in many instances those receiving these orders erased or marked out the name of one authorized to make such assessment and substituted another name therefor. The same statement may be said to be true in regard to parties authorizing particular ones to pay poll taxes for them. However, even if these orders were given authorizing the assessment of a poll tax, or if the assessment blanks were properly filled out they were not delivered to the assessor, nor were they delivered to the county clerk, nor

was there a separate list made and certified by the assessor or by the county clerk as to these delinquent assessments, as required by law. (Section 4693, Pope's Digest.)

But those agents attempting to assess and pay for such delinquents probably, as a matter of expediency, delivered the so-called assessment sheets to the collector's office where the names of all those who had in such manner been assessed as delinquents were entered upon the tax books by the collector, or by one of his deputies, or by someone acting in that capacity, and all such names so entered were written in with red ink. There was, therefore, no difficulty in identifying those who had been assessed in that manner.

It is argued now that this was a substantial compliance with the laws with regard to assessments. The foregoing general statement must be taken as applying substantially to everyone of those assessed as a delinquent. There is a possibility that there may have been a few who were assessed properly as delinquents, but the particular ones questioned here were those whose names were placed upon the books, as above stated, in red ink and by the tax collector, or his deputy, or someone employed in that office.

The applicable law may be found in Pope's Digest, § 4695. It is stated there that it shall be unlawful for any person to cast a ballot in any election held as set forth in § 4691 of Pope's Digest, unless such person shall have previously assessed and paid a poll tax, which assessment and payment shall have been made by the person casting the vote, or by someone authorized by such person to assess and pay the tax aforesaid.

A further provision, § 4695, Pope's Digest, is that where the assessment and payment shall have been made by an agent such agent must exhibit to the assessing officer and collecting officer authority in writing from the person or persons desiring assessment to be made of the poll tax to be paid, and it was the duty of the assessing officer and collecting officer to file and keep such written authority for a period of two years.

Section 4698 of Pope's Digest provides especially that it shall be unlawful for any collecting officer in the state at any time after the poll tax records have been delivered to him by the county clerk for the purpose of collecting personal taxes to add to said tax books the name of any person whose taxes have not been previously assessed as provided by law, and that it shall be unlawful for such collecting officer to issue a poll tax receipt to any such person whose name does not appear on the tax books in the manner provided by law. Such is the mandate of the statutes of the state, and perhaps it would add nothing to enter upon any extended discussion of the right or power or authority of the sheriff or collector to add names to the tax lists.

This court has already passed upon and determined substantially the question under consideration. In the case of *Cain* v. *Carllee,* 168 Ark. 64, 269 S. W. 57, it was held that one who was delinquent might procure himself to be properly assessed by complying with § 3738, Crawford & Moses Digest (now § 4693, Pope's Digest) and have his name placed upon the books as a voter. But a substantial compliance with the statute was necessary, the reason being that this was done to protect the revenue and to prevent fraud in elections, and it was there expressly held, as stated by the statute, that the county collector did not have the power to assess a poll tax, collect it and deliver receipt to the elector. This is substantially in conformity to the announcement in *Craig* v. *Sims,* 160 Ark. 269, 255 S. W. 1, and *Taaffe* v. *Sanderson,* 173 Ark. 970, 294 S. W. 74.

Again it was held that the tax collector was without power to issue a poll tax receipt that would qualify one to vote unless properly assessed. *Morrow* v. *Strait,* 186 Ark. 384, 53 S. W. 2d 857.

The matter was, also, discussed, perhaps somewhat more fully in the case of *Collins* v. *Jones,* 186 Ark. 442, 54 S. W. 2d 400.

It has, also, been determined that there are two methods of assessing the delinquent. They are held to be not inconsistent, but supplementary. One may apply,

88

also, to the assessor. *Tucker* v. *Meroney,* 182 Ark. 681, 32 S. W. 2d 631.

All these statutes and cited authorities must make it clear that the tax collector's assessment was no assessment.

Not only was the ruling of the judge in conformity with the statute, but justified by all our decisions in which these statutes have been discussed. To protect the public revenue, to prevent fraud in elections, these statutes should be and must be substantially followed. They are perfectly reasonable and in conformity with the principles of checks and balances prevailing in the various departments of state and county governments.

This is the only single proposition urged by the appellant in which it is contended that, if the court's ruling were reversed in this regard, the result of the election would be changed. Since it appears that the court's ruling in this respect is without error it must be approved.

The only reason for discussing the remaining alleged errors is the fact that, if the court's ruling as to all of them should be changed, the result of the election might be affected thereby.

The next proposition that is submitted is that the court erred in regard to his ruling concerning first voters. Little need be said in regard to that proposition, except that it is at least passively admitted, if not expressly so, that the statutes were not followed. In some instances, there appeared upon the tally sheets the name of a voter and after it a notation, by insertion of the words "first voter." There was no separate list made of these first voters, whose affidavits were attached to the ballots cast by them. In a few instances, however, we do not know how many, some affidavits were attached to ballots, but in no case does it appear that there was ever a separate list. It is argued that this was a sufficient compliance, under the ruling in the case of *Robinson* v. *Knowlton,* 183 Ark. 1127, 40 S. W. 2d 450. It is true that the court said in that case that the statutes providing for contesting of elections should be liberally construed, and that the purpose of the contest is to determine what candidate

received the greatest number of (legal) votes. But we find nothing in that decision that justifies the flouting of the statutory requirement that might have been so easily met, of making a separate list of the so-called first voters. The argument offered in this regard begs the question, that is to say, it is argued that, in the absence of fraud and upon a positive showing that the voter had done all he could, it would be unwise and unjust to hold that the failure of an election officer to perform a regulatory act would void that person's vote. It is the same argument that has been frequently made, that courts, by their rulings, disfranchise those who seek to cast their vote in good faith for their choice in an election. Resort to such argument indicates the weakness of the position. For twenty-five years the people of this state, by initiated acts and by legislative enactments, have not only cried out and protested against fraud in elections, but they have sought remedies, even invoked penalties to prevent the circumvention or thwarting of the will of the people expressed at the polls. Where efforts have been made to comply substantially with the law, though such efforts may not be in exact conformity with the statute itself, there may be in some instances reason and excuse to overlook such noncompliance, particularly when such failure may not be in violation of a mandatory statute, or may not, in itself, be used in aid of fraudulent conduct. It is not shown that there were any substantial number of such ballots, or that they would materially affect the court's ruling if counted. There certainly was no prejudice, if ever it should be determined that the court's ruling was erroneous which we do not hold.

In one voting precinct, Kimbro, the election officers failed to tabulate the vote cast. There were only fifteen ballots, and these were preserved and entered into this contest, where the unchallenged votes, or those determined to be legal were counted. It is urged, contrary to appellant's theory in presenting the matter above discussed, that these ballots should have been ignored, although there is no suggestion of fraud, nor is there any implication of any error in the court's count or tabulation

It is, also, argued seriously, upon another matter, that the court, of its own motion, had erroneously required the ballots withdrawn from the ballot boxes and counted after contestee had announced the withdrawal of his challenge as to these particular votes or ballots. We state the conditions as we understand them to be. The ballots were not called for or produced by order of the court until proof was offered and ruled upon by the court to show that these certain ballots were illegal. After this was done appellant sought to dismiss that phase of his complaint, desiring to avoid an inspection of these ballots to determine for whom they had voted. The trial court announced that it was his duty to determine which one of the rival candidates had received the highest number of legal votes, and that neither party would be permitted to withdraw a challenge as to any ballots after the evidence had been heard in regard thereto, and the invalidity of such ballots had been determined.

The theory of the appellant is that he might abandon any phase of his case at any time before judgment. Let it be conceded that ordinarily such a rule might prevail in the prosecution of private litigation. Whatever may be the law in that regard, where only individual rights are concerned, such a law would be hopelessly unsound in an election contest wherein the public is vitally interested in the officers to be elected.

Appellant, also, argues that the court erred in permitting the contestant, after he had rested, to reopen his case and offer additional names, concerning which proof already in evidence before the court was applicable. We will dispose of this matter by saying there was no abuse of discretion on the part of the court in so proceeding. Appellant does not even urge surprise, lack of preparation, or any other deficiency, or condition that might have operated to his prejudice or required time or investigation and examination caused by this ruling.

The final matter argued upon this appeal is to us a most serious one, but, like the trial court, we have no desire to avoid the responsibility imposed by law in a

matter so vitally important to a healthy, wholesome condition of state and county politics. Without enlarging upon this record, let it be said that it was not only charged and proven, but it was also admitted by Mr. Horne that he bought and paid for many poll tax receipts, for those who were not members of his family, nor were they for parties who had authorized him so to do by any written order. On the night of June 15, he gave his check for $293 to the tax collector, who testified that this money was for poll tax receipts issued and the penalty upon some of them. At that time, there was delivered to Mr. Horne, according to the tax collector, fifty or seventy-five receipts in an envelope. Mr. Horne says there were only twenty-five or thirty of these receipts. That admission confesses the whole charge without regard to the attempted explanations that Mr. Horne owed several different parties who procured poll tax receipts and had them charged to Mr. Horne, who paid these charges, because he owed the particular debts to his friends who were interested in the same manner, if not to the same extent that he was in the result of the election.

This is the second time a matter of this kind has come before the court, the first case being *Lady* v. *Smith,* 196 Ark. 1059, 121 S. W. 2d 99. We affirmed the decision of the lower court in that case. We would have to affirm this decision upon this point if there were no other evidence here except that of the appellant himself. See § 4700, Pope's Digest.

Upon the whole case we find no prejudicial error. Judgment of the trial court is accordingly affirmed.