CITY OF NEWPORT *v.* SMITH.

5-3040                                          367 S. W. 2d 742

Opinion delivered May 20, 1963.

*McDaniel, Ward & Mooney,* for appellant.

*Kaneaster Hodges* and *Wayne Boyce,* for appellee.

ED. F. McFADDIN, Associate Justice. On August 21, 1962, an election was held in the City of Newport on the issue of the City Manager form of municipal government. The official returns showed 888 votes against the City Manager plan, and 866 for the plan. In due time, the appelles herein instituted this election contest, claiming a number of named persons to have voted illegally. The contestees (appellants herein) cross complained and challenged a number of named voters. Trial in the Circuit Court resulted in a judgment finding and declaring that there were 849 legal votes for the City Manager plan, and only 834 legal votes against it. Thus, the Circuit Court judgment showed a majority of 15 votes for the City Manager plan; and from that judgment there is this appeal by the contestees, presenting the points herein discussed.

I. *Convicted Felons.* The contestants challenged a number of named voters, claiming: ''The following persons voted against the passage of said measure whose votes were illegal for the reason that each one had prior to said election been convicted of a felony and was therefore not a qualified elector and was ineligible to vote: . . . '' To that allegation, the contestees filed a special demurrer because the contestants had failed to negative the possibility of a pardon of the convicted felon. The Trial Court denied the demurrer, and we see no error. Section 3-101 Ark. Stats., in discussing persons disqualified, says:

''No one who has been convicted of any offense which is a felony at the common law, or by statute, shall be allowed to vote in any election in this State, unless such person shall have been pardoned by the Governor, and the record of the court wherein such person shall have been convicted shall be conclusive evidence of his conviction.''

The contestants alleging the disqualification had the burden of proving the felony; and in the offering of such proof the contestees could easily have established that there had been a pardon. Certainly in the pleadings stage, the Trial Court was correct in overruling the contestees' demurrer.

II. *Irregularities In Box 1-A.* The election officials of this box failed to place the number of the voter on the stub, as required by the statute:[1] rather, the election officials endorsed the number of the voter on the back of the ballot, and the list of numbers on the tally sheet was from 1 to 110, consecutively, as the ballots had been numbered. The fact that the judges had not endorsed the number on the stub of each ballot was not contained in any of the pleadings. It was only when the box was opened that the irregularity was discovered. Appellants then claimed that since the election officials had failed to comply with the statute, no votes should be stricken from the Box 1-A. The Trial Court was correct in rejecting the appellants' argument. There was no allegation of fraud in the Box 1-A; and it was not until the box was opened that it was discovered that the judges had endorsed the numbers on the back of the ballots instead of on the detachable stubs. In the absence of any allegation of fraud, it would be putting form above substance to refuse to discard illegal votes from this box merely because the election officials put the number on the back of the ballot instead of on the detachable stub.

III. *Irregularities In Box 1-B.* Ballots Nos. 24 and 49 were challenged in this box; and when the box was opened to identify the challenged ballots it was discovered, for the first time, that the box was entirely empty. Thereupon, contestees (appellants here) moved:

"In the absence of any ballots being found in the official ballot box 1-B by which the Court may determine whether any challenged vote was cast 'for' or 'against' the City Manager proposition, defendants request the Court to declare that the integrity of box 1-B has been wholly destroyed, and that the results certified by the election commissioners for box 1-B be completely discarded and the results thereof subtracted from the 'for' and 'against' totals in the election as a whole."

---

[1] Section 3-831 Ark. Stats. provides: "Every qualified elector shall be furnished with one (1) ballot. Before delivering the ballot to the elector the Election Judge shall endorse his initials on the upper back (or outerside) of the ballot. A Judge shall also place the number of the voter (which is a designation of the order of his appearance according to the List of Voters) in the blank space in the lowest one (1) inch on the face of the ballot following the words 'List of Voters Number . . .'"

The Court wisely reserved ruling on the motion until the conclusion of the litigation; and then when Box 1-A was opened there was found in Box 1-A a manila envelope containing what the Court found to be the original official ballots that had been cast in Box 1-B. In other words, the ballots from Box 1-B had been placed in a manila envelope and then placed in Box 1-A instead of in Box 1-B. The integrity of the ballots in Box 1-B was not completely destroyed. The appellants did not allege or attempt to prove any fraud by any of the election officials in Box 1-B. Only two questioned ballots were involved; and it would certainly be a deprivation of the right of franchise to the other voters in Box 1-B to have their entire ballots thrown out, when only two votes in the box were questioned. The Trial Court correctly overruled the defendants' motion, as above copied.

At the beginning of the trial the Court announced the procedure in the election contest; and no one disagreed. Here was the announcement by the Court of the procedure:

"From this point on there will be no more amendments to the pleadings except the addition of names, if either side should choose to make that sort of an amendment, from issues already raised by the pleadings. In other words, the pleadings are settled as of this time. The procedure that we will follow will be that the contestants will be permitted to challenge and possibly disqualify all the votes that they question first, then the contestees will be permitted to challenge and possibly disqualify all of the votes which they question because both sides have questioned the legality of various votes. The Court will rule on each of these challenged votes compiling a list as we go and when this list is completed the record will be closed as far as evidence is concerned. The Court will then order the necessary ballot boxes, if any, brought to the courtroom at which time we will determine how many illegal votes were cast and these will be deducted from the certified totals."

Under this procedure only the challenged ballots were involved, and not the unchallenged ballots, and the motion

by contestees (appellants here) to discard the entire box was without merit.

IV. *The Absentee Box.* This box presents the most flagrant violation of election laws of which honest election officials could have been guilty, and gives us most serious concern;[2] but we emphasize that there is not the slightest allegation or suspicion of fraud; and it is this entire absence of any allegation or evidence of fraud or corruption that accounts, in a large measure, for the conclusion we reach on this absentee box. The contestees (appellants) insisted that the integrity of the box had been destroyed because: (a) one of the election officials tore up some of the ballots; (b) the absentee box was never delivered to the proper official at the court house; and (c) the box and the ballots cannot be found.

The evidence established that the judges and clerks of the absentee box counted the votes in the office of the County Clerk the night of the election, with a group of people present, varying from a few to more than a score. As each ballot was taken out of the box, the name of the voter was called, and how such person had voted, that is, ''for'' or ''against'' the City Manager plan. This list was compiled on a form for certificate of judges and clerks at the election (§ 3-1007 Ark. Stats.), but those counting the

---

[2] The allegations of the contestees regarding this absentee ballot box are as follows: "Contestees allege that for the election held on August 21, 1962, in Newport, Arkansas, there was provided a separate and special ballot box for the reception of 'absentee' ballots. The ballots in said Absentee Box were counted under the supervision of (the three named Judges). The clerks on the Absentee Box were (named). During the process of counting the ballots in said box, it was observed that (one Judge) was tearing up ballots as they were counted and tossing the remnants in a waste basket. It is not known how many ballots this Judge destroyed before his acts were discovered and stopped. Notwithstanding the fact that this Judge probably did not know he was violating a law, his actions utterly destroyed the integrity of the absentee box. When the count of ballots in the Absentee Box was almost complete, (one Judge) departed, leaving the ballot box in the custody of (the other election officials). The said Absentee Ballot Box has never to this day been delivered by either of said Judges—nor anyone else—into the custody of either the County Clerk or the County Treasurer. Although contestees, through their attorneys, have made a diligent effort to locate said ballot box, it has not been found. The integrity of the votes cast in the Absentee Ballot Box has been utterly and completely destroyed and the returns from said box should be purged from the totals cast up by the election officials." We have omitted from the quotaton only the names of the Election Judges and Clerks, and indicated by parenthesis in each instance where such omission appears.

ballots had written "For" at the head of one column, and "Against" at the head of the other column; and the name of the voter was placed in the column as he had voted. Thus, all secrecy of the ballot was completely destroyed. A total of 88 votes were cast in the absentee box: 67 had voted for the City Manager plan, and 21 had voted against it. When the 88 votes were compiled, two of the election judges and one of the clerks signed the form and left it on the table in the County Clerk's office; and this form remained in the County Clerk's office. In a day or two, the Clerk requested the Circuit Judge to impound the form; and it was introduced in evidence in this case as Exhibit No. 17. This Exhibit No. 17 is all that was introduced from the absentee box. The ballots were scattered and lost; and this one Exhibit No. 17 is all that remains.

In the trial the Circuit Court accepted the Exhibit No. 17 as valid; and, using it as a basis, held seven votes to have been illegal in the absentee box. The question is whether we should allow this Exhibit No. 17 to be used to show the result of the absentee box. We need not mention the numerous sections of the statutes that were violated by the election officials of the absentee box: the question is whether the entire absentee box should be discarded, or whether only the challenged individual votes should be thrown out; and we emphasize again that there were no allegations of fraud or corruption against the officials of the absentee box.

We think the answer to our problem is contained in the case of *Dixon* v. *Orr*, 49 Ark. 238, 4 S. W. 774. In that case, no return was ever made from Little River Township in Miller County in the election for the office of Sheriff; and Dixon contended that the entire box should be suppressed. The box and tally sheets had been lost entirely, and "the election officers displayed a remarkable deficiency of memory as to the state of the vote." But there were two witnesses who were present when the entire vote was counted in the box, and they testified that 114 votes were cast in the precinct; and of these Dixon received 27, and Orr 87. Such testimony was permitted to stand as the return from that box. The Court said:

"The real inquiry is, who received a majority of the legal votes cast in Miller County for the office of Sheriff? Upon a contest all such votes must be counted, whether they were returned or not. *Constitution of 1874, art. 3, sec. 11; Govan* v. *Jackson, 32 Ark. 553.* Where an election has been legally held and fairly conducted, nothing will justify the exclusion of the vote of an entire precinct except the impossibility of ascertaining for whom the majority of votes were given.

"Now, the poll books and tally sheets made out and properly certified by the election officers, and the ballots themselves, are the primary evidence of the result of an election. But if these are lost, destroyed or stolen, this does not destroy the validity of the count, but resort must be had to secondary evidence."

The authenticity and correctness of the Exhibit No. 17 introduced in the case at bar was thoroughly established. It shows the name of each person who voted an absentee ballot, and exactly how that person voted, and no one has attempted to dispute the correctness of the exhibit. In the absence of fraud or corruption, the Exhibit No. 17 should stand. We have a number of cases which hold that a voter is not to be disfranchised because of the failure of the election officials to obey all the election laws. *Henderson* v. *Gladish,* 198 Ark. 217, 128 S. W. 2d 257. In *Baker* v. *Hedrick,* 225 Ark. 778, 285 S. W. 2d 910, we quoted Judge Eakin's language in the case of *Patton* v. *Coates,* 41 Ark. 111, as to the *quantum* of evidence required to destroy the integrity of an entire box:

" 'The wrong should appear to have been clear and flagrant; and in its nature, diffusive in its influences; calculated to effect more than can be traced; and sufficiently potent to render the result really uncertain. If it be such, it defeats a free election, * * * . If it be not so general and serious, the court cannot safely proceed beyond the exclusion of particular illegal votes, or the supply of particular legal votes rejected.' "

In *Jones* v. *Glidewell,* 53 Ark. 161, 13 S. W. 723, Chief Justice Cockrill said:

"It is a serious thing to cast out the votes of innocent electors for acts done by others, and it is the province of courts to see that every legal vote cast is counted where the possibility exists."

We therefore conclude that, in the absence of proof of fraud or corruption, and in the absence of evidence going to destroy the integrity and correctness of Exhibit No. 17, the Trial Court was correct in refusing to cast out the entire absentee box, and was correct in allowing Exhibit No. 17 in evidence.

V. *Individual Ballots.* The remaining questions raised by the appellants relate to the correctness of the rulings of the Trial Court regarding the ballots of individual electors. The appellants claim that in thirteen instances the Trial Court held voters ineligible when, in fact, each such voter was eligible. Also the appellants claim that the Trial Court erred in refusing to cast out nineteen votes. It would unduly prolong this opinion and serve no useful purpose to discuss each of these ballots, give the factual situation, and the ruling of the Court thereon. In each instance it was a disputed question of fact as to the residence of the voter; and the determination of such question by the Trial Judge is as final and conclusive as is the verdict of a jury. *Logan* v. *Moody,* 219 Ark. 697, 244 S. W. 2d 499; *Williams* v. *Buchanan,* 86 Ark. 259, 110 S. W. 1024. We have carefully examined the evidence as to each of the thirty-two ballots in question, and conclude that no reversible error has been shown by appellants.

The judgment is affirmed.