Ronald WHITLEY *v.* James CRANFORD, Russell Cranford and Hot Spring County Board of Election Commissioners

03-183                                                        119 S.W.3d 28

Supreme Court of Arkansas
Opinion delivered September 25, 2003

*Crawford Law Firm*, by: *Michael H. Crawford*, for appellant.

*Glover Law Firm*, by: *David W. Glover*, for appellees.

JIM HANNAH, Justice. Ronald Whitley appeals an order of the Hot Spring County Circuit Court voiding the May 21, 2002, Hot Spring County Democratic Preferential Primary for the office of Justice of the Peace, District 4. Whitley alleges that the trial court erred in voiding the election where 183 voters were presented with ballots omitting the Justice of the Peace race, where there was no fraud, and in finding that the incomplete ballots deprived the 183 voters from their right to participate in the election. Whitley also alleges error in denial of his motion for a new trial where it was only discovered after the circuit court voided the election that a new election would not be set. We hold that providing 183 voters with ballots omitting the Justice of the Peace race rendered the outcome of this election uncertain, and required that the election be voided. We find no abuse of discretion in denial of the new trial motion and affirm the circuit court.

### Facts

Ronald Whitley and James Crawford opposed each other as candidates in the Democratic Preferential Primary for the position of Justice of the Peace, District 4, Hot Spring County. On election day, for reasons that are not stated by the parties, nor apparent from the record, some ballots included the District 4 Justice of the Peace race, and some did not. The parties have not argued and the record does not show that the error in the ballots was discoverable and correctable at any time prior to the election. Rather, the problem with the ballots was only apparent after the election began.

Ballots used at the Fenter-B polling site in the election on May 21, 2002, did not include the Justice of the Peace race. The record shows that seventy-six voters cast ballots at the Fenter-B polling site. Ballots used at the Ward 4 polling site in the election on May 21, 2002, did not include the Justice of the Peace race, however, voters brought the omission to the attention of polling officials, and the correct ballots were then used. Nonetheless, 107 voters had already cast ballots before the correction was made. The total number of voters who voted using ballots omitting the Justice of the Peace races is 183. Of votes cast using ballots including the Justice of the Peace race, 299 were cast for Whitley, and 244 ballots were cast for Cranford. Out of the votes cast in the Justice of the Peace race, Whitley received fifty-five more votes than Cranford.

There were 1172 ballots cast that contained no vote in the Justice of the Peace race, which includes the 183 voters who were presented with ballots that did not include the race. When the 1172 under votes are added to the 299 votes cast for Whitley and the 244 votes cast for Cranford, the total ballots presented to voters in the Justice of the Peace race is 1715. Five hundred forty-three people cast votes in the Justice of the Peace election.

Cranford filed a "Petition to Contest Certification of Nomination and Vote and for Other Relief." The circuit court held a hearing, and then voided the election, finding that the unintentional failure to include the Justice of the Peace race on the ballots presented to 183 voters deprived those voters of the right to participate in the election, rendered the result of the election uncertain, and defeated the requirement of a free election.

*Election Contests*

Cranford's petition seeks to have the certification of vote and the vote set aside. Cranford thus asked the circuit court to void the election. Election contests are of two types, one where a candidate seeks an order declaring himself or herself the winner, and a second where a qualified voter seeks to void the election. *King v. Davis*, 324 Ark. 253, 256, 920 S.W.2d 488 (1996). In the first type, an election contestant seeks possession of an office, and in the second type, a voter seeks to void the entire election because it was not fair and equal and therefore uncertain in its outcome.

In the case before us, no one is seeking possession of the office. Rather, it is a suit to void the election because the result is uncertain. Cranford alleged that it was not possible to determine the outcome of the election. Under that assertion, leaving the election certification as it stood would mean that the possessor of the office would not occupy that position based on a free and equal election as guaranteed by the Constitution. The 183 voters who received the incomplete ballots could not vote. Thus, those 183 voters did not cast a ballot in the justice of the peace race, and there are therefore no legal votes to be added or illegal votes that could be excluded. There are no votes by the 183 voters to consider, and no way to determine how they would have voted short of calling the 183 voters in to court to declare how they would have voted. Such an endeavor would be fraught with intimidation and contrary to the well-founded principle of secret ballots. On this subject in *Rubens v. Hodges*, 310 Ark. 451, 837 S.W.2d 465 (1992), this court stated:

> Lillian Hodges argued that the trial court could count votes for her that were never cast at the election and her argument was based upon an inference, not the holding, in *Files v. Hill*, 268 Ark. 106, 594 S.W.2d 836 (1980). If this case had been fully contested on an adversarial basis, it might have been developed that we have no statute providing for such a remedy, and in *Watson v. Gattis*, 188 Ark. 376, 65 S.W.2d 911 (1933), in discussing the language of an earlier, but comparable, constitutional provision, we wrote, "The elector himself would not be permitted to testify that, having failed to vote specifically for any candidate for any particular term, he nevertheless intended that his ballot should express his assent . . . ." Many other jurisdictions have addressed the issue, and the general rule is that while the elector may testify that he was wrongfully prevented from voting, and such testimony may be used to void the entire election, the elector may not testify that he intended to vote for a particular candidate. 29 Elections, C.J.S. 281 (1965).

*Rubens*, 310 Ark. at 455. Votes that were never cast may not be counted.

The term "election contest" is used in Arkansas to refer both to an action challenging the certification of who won the election as well as an action challenging the validity of the election. *King, supra; see also Rich v. Walker*, 237 Ark. 586, 374

S.W.2d 476 (1964); *Curry v. Dawson*, 238 Ark. 310, 379 S.W.2d 287 (1964). However, the two actions are distinct. *Rubens v. Hodges, supra; see also Phillips v. Earngey*, 321 Ark. 476, 902 S.W.2d 782 (1995). The case before us involves an assertion that the validity of the conduct of the election is uncertain and should be voided.

## Voiding Elections

■ Article 3, section 2, of the Arkansas Constitution, provides that "[e]lections shall be free and equal." This has been characterized as a guaranty that "[e]lections shall be free and equal." *Henderson v. Gladish*, 198 Ark. 217, 224, 128 S.W.2d 257 (1939). This guarantee must exist because "[i]t is of the utmost importance that the public should have confidence in the administration of the election laws, and to know that the will of the majority, when fairly expressed, will be respected." *Wheat v. Smith*, 50 Ark. 266, 280 (1887). Where an election is not free and equal as required under the Constitution, this court has voided elections. The first instance in the cases is where the result was rendered uncertain by fraud and intimidation. The oft-cited case of *Patton v. Coates*, 41 Ark. 111 (1883), interprets article 3, section 2, of the Constitution in voiding an election because fraud and intimidation rendered the result uncertain. In another cases where the voters have received insufficient notice, elections have also been voided. *Phillips v. Mathews*, 203 Ark. 100, 155 S.W.2d 716 (1941); *see also Phillips v. Rothrock*, 194 Ark. 945, 110 S.W. 26 (1937). It must also be noted that although the election in the case was not voided, in *Swanberg v. Tart*, 300 Ark. 304, 778 S.W.2d 931 (1989), this court discussed the alleged failure to comply with absentee voting laws, but declined to void the election, noting that elections will not be voided where the wrong does not render the result uncertain. See also *Wheat, supra,* where this court affirmed a finding by the trial court that there was sufficient notice.

In the case before us, of the 1715 voters that received ballots, 543 people cast votes in the Justice of the Peace race. Eleven hundred seventy-two voters received ballots, but did not cast a vote in the Justice of the Peace race. Of these 1172 voters, 183 received ballots that did not include the Justice of the Peace race.

In voiding the election, the 543 votes of those who cast a vote in the Justice of the Peace race were held for naught. The wrong or error that caused the trial court to conclude that the 543 votes were void was a failure by election officials to provide accurate and correct ballots to all polling sites.

■ This court has a long history of plainly expressing its reluctance to void an election. In *Alexander v. Davis*, 346 Ark. 310, 58 S.W.3d 330 (2001), this court recently noted that there are narrow limits that must be followed in exercising the power to void an election. *Id.; see also, Henard v. St. Francis Election Comm.*, 301 Ark. 459, 784 S.W.2d 598 (1990). In *Jones v. Glidewell*, 53 Ark. 161, 13 S.W. 723 (1890), this court stated:

> It is a serious thing to cast out the votes of innocent electors for acts done by others, and it is the province of the courts to see that every legal vote cast is counted when the possibility exists.

*Jones*, 53 Ark. at 175. This language from *Jones* has been cited on a number of occasions over the years. *See Alexander, supra; Parker v. Hendricks*, 241 Ark. 279, 284, 407 S.W.2d 385 (1966); *City of Newport v. Smith*, 236 Ark. 626, 633, 367 S.W.2d 742 (1963); *Baker v. Hedrick*, 225 Ark. 778, 784, 285 S.W.2d 910 (1956). More recently in *Womack v. Foster*, 340 Ark. 124, 149, 8 S.W.3d 854 (2000), this court similarly stated, "It is also well settled that the courts do not favor disenfranchising a legal voter because of the misconduct of another person, such as an election official." In *Womack*, the invalid absentee ballots did not render the result doubtful, and the court quoted *Spires v. Compton*, 310 Ark. 431, 837 S.W.2d 459 (1992), where we stated:

> This court has held many times that elections will not be invalidated for alleged wrongs committed unless those wrongs were such to render the result doubtful. *Swanberg*, 300 Ark. 304, 778 S.W.2d 931. Put in other terms, we have said that the failure to comply with the letter of the law by election officers, especially in matters over which the voter has no control, and in which no fraud is perpetrated, will not as a general rule render an election void, unless the statute expressly makes it so.

*Spires*, 310 Ark. at 434. In *Womack*, the petitioner failed because he could not show a doubtful outcome, not because no fraud was alleged with regard to the 5000 other votes.

From these cases it is clear that where it is possible to purge the illegal or improper votes and leave the election valid, this court will do so. It is also clear that even a failure to comply with the law by election officials does not result in automatic invalidation of the election. In *Patton, supra,* this court first interpreted article 3, section 2, and expressed a concern in discussing the power to void an election:

> Upon the other hand, it devolves upon the courts not to press this principle too far, nor apply it lightly to slight indications of fraud, violence or intimidation. Its application, indeed, is a matter of the greatest and most anxious responsibility inasmuch as it involves, necessarily, the disenfranchisement, in the particular election, of all the honest voters of the township.

*Patton,* 41 Ark. at 126. "Where an election has been legally held and fairly conducted, nothing will justify the exclusion of the vote of an entire precinct except the impossibility of ascertaining for whom the majority of votes were given." *City of Newport,* 236 Ark. at 632 (citing *Dixon v. Orr,* 49 Ark. 238, 241, 4 S.W. 774 (1887)).

■ In *Patton* this court cited article 3, section 2, of the Arkansas Constitution, which provides in part: "Elections shall be free and equal..." *Patton,* 41 Ark. at 126. The oft quoted test of when an election may be voided was set out in *Patton:*

> The wrong should appear to have been clear and flagrant, and in its nature diffusive in its influences, calculated to effect more than can be traced, and sufficiently potent to render the result really uncertain. If it be such, it defeats a free election, and every honest voter and intimidated or deceived voter is aggrieved thereby. It is his interest to sacrifice his own vote to right the evil. If it be not so general and serious, the court cannot safely proceed beyond the exclusion of particular illegal votes, or the supply of particular legal votes rejected.

*Patton,* 41 Ark. at 126. This test has been cited a number of times since 1883. *See Alexander, supra; King supra; Henard, supra; Parker, supra; Lewelling v. Mansfield Sch. Dist.,* 240 Ark. 237, 398 S.W.2d 665 (1966); *City of Newport, supra; Wood v. Brown,* 235 Ark. 258, 361 S.W.2d 67 (1962); *Baker, supra.*

The facts of *Patton* involve grievous and pervasive fraud and intimidation. In *Patton* the court discussed that the result of the election in that case was rendered uncertain by fraud and coercion, noting that, "[i]t can never be precisely estimated how far the latter (fraud) extends. Fraud is secret, and timidity shrinks from observation...yet it cannot be said that elections are 'free and equal' where fraudulent combinations for illegal voting override honest votes...." *Patton*, 41 Ark. at 124. Although fraud rendered the election result uncertain in *Patton*, this court did not limit its holding to fraud. Article 3, section 2, contains no mention of fraud or intimidation. As noted and cited above, the test of *Patton*, which has been cited by this court on at least eight occasions states that "[t]he wrong must appear to have been clear and flagrant, and in its nature diffusive in its influences, calculated to effect more than can be traced, and sufficiently potent to render the result really uncertain." *Patton*, 41 Ark. at 126. Conversely, the discussion about precisely how far the fraud extends is only cited in *Jones v. Glidewell*, 53 Ark. 161 (1890), a case where this court stated that allegations of fraud and intimidation similar to those in *Patton* were alleged.

■ In *Patton*, this court did not limit the test to showing fraud and intimidation. Rather than use the words "fraud and intimidation" in the test, this court in *Patton* used the word "wrong." *Patton*, 41 Ark. at 126. The wrong must render the result of the election uncertain. If the wrong can be purged then the election could be valid because it would no longer be uncertain.

> [E]lections will not be invalidated for alleged wrongs committed unless said wrongs were such to render the result doubtful. In order to destroy the result of an election it must be shown that wrongs against the freedom of election have prevailed, not slightly and in individual cases, but generally and to the extent to rendering the result doubtful.

*Lewelling*, 240 Ark. at 244. *See also King, supra; Tittle v. Woodruff*, 322 Ark. 153, 907 S.W.2d 734 (1995); *Files v. Hill*, 268 Ark. 106, 594 S.W.2d 836 (1980); *Douglas v. Williams*, 240 Ark. 933, 405 S.W.2d 259 (1966).

Later cases reinforce the conclusion that elections may be voided in the absence of fraud. In *Files, supra,* this court found that there was no showing that even if the disputed votes had been

counted, the outcome would have been different. The discussion in *Files*, shows that the issue of whether an election is to be voided is based on whether the result of the election is uncertain:

> In Arkansas, equity has no jurisdiction of any case involving the right to vote, or any political right, even where fraud is alleged. *Catlett v. Republican Party*, 242 Ark. 283, 413 S.W.2d 651; *Walls v. Brundidge*, 109 Ark. 250, 160 S.W. 230, Ann. Cas. 191 SC 980; *Hester v. Bourland*, 80 Ark. 145, 95 S.W. 992; *Hutto v. Rogers*, 191 Ark. 787, 88 S.W.2d 68; *Rich v. Walker*, 237 Ark. 586, 374 S.W.2d 476; *Miller v. Tatum*, 170 Ark. 152, 279 S.W. 1002. There is no allegation, however, in Arnold's complaint that anyone acted fraudulently. Arnold relies entirely on the assertion that an unknown number of people were deprived of their right to vote for Files as a ground for voiding the election. Nowhere in Arnold's complaint does he allege that the irregularities enumerated were sufficient to render the outcome of the election really uncertain and such an inference drawn from those allegations would be strained indeed. Assuming that he and his class had standing to bring the suit, his allegations did not state a cause of action. *Baker v. Hedrick*, 225 Ark. 778, 285 S.W.2d 910. In the cited case, we pointed out that it was a serious matter to void an entire election. We also stated that we had held in *Patton v. Coates*, 41 Ark. 111, that, in order to do so, the wrong must be clear and flagrant, diffusive in its influences, calculated to effect more than can be traced and sufficiently potent to render the result clearly uncertain. Otherwise, the court cannot safely proceed beyond the exclusion of particular illegal votes or the supply of particular legal votes rejected. It is desirable that election returns have a high degree of stability and finality. *Reed v. Baker*, 254 Ark. 631, 495 S.W.2d 849. An election should not be voided for any wrong less grave than that described in Patton. The purpose of any contest of an election is to determine which candidate received the greatest number of votes, and we have held that exclusion of votes, even if erroneous, is not prejudicial unless there is a showing that, if counted, those would materially affect the result in an election contest. *Horne v. Fish*, 198 Ark. 79, 127 S.W.2d 623. Appellant's allegations do not establish that the result was really uncertain or name any particular votes, except his own, which could have been supplied in the proceeding. This would not be sufficient to justify the court in setting aside the election. See *Wilson v. Ellis*, 230 Ark. 775, 324 S.W.2d 513.

*Files*, 268 Ark. at 116–117. As is apparent from the above quote in *Files*, and a careful reading of *Patton*, an election may be voided when the outcome is uncertain. Fraud is not an essential element. The Constitution does not even mention fraud. In *Files*, Arnold was a voter who brought an action to void the election. *Files*, 268 Ark. at. 108. Arnold did not make an allegation of fraud; however, in noting the lack of fraud, this court did not state that because of the lack of fraud he could not proceed in proving the results of the election were uncertain, but instead stated, "[A]rnold relies entirely on the assertion that an unknown number of people were deprived of their right to vote for Files as a ground for voiding the election. Nowhere in Arnold's complaint does he alleges that the irregularities enumerated were sufficient to render the outcome of the election really uncertain...." *Files*, 268 Ark. at 117.

It is only where the results of the election are uncertain that an election will be voided. If there is a way to undo the wrong and determine who won, this court has stated, "[t]he court cannot safely proceed beyond the exclusion of particular illegal votes rejected or the supply of particular legal votes rejected." *Files*, 268 Ark. at 117. However, where the wrongs are so serious that they render the election results uncertain or doubtful, there is no way for the trial court to determine who won and who lost the election.

In the case before us, 183 people were presented ballots that simply omitted the Justice of the Peace race. After the election, Whitley was certified by the Hot Spring County Board of Election Commissioners as receiving 299 votes, or fifty-five votes more than Cranford. Had the 183 ballots included the Justice of the Peace race, the outcome might have been different. It is impossible to determine how many of the 183 voters would have voted in the race and of that number how many would have voted for which candidate. Where the result is uncertain, the entire vote must be held for naught. *Patton, supra.* There is no other possible outcome because it is impossible to determine who would have won had the 183 voters cast their ballots in the Justice of the Peace race. Although the 183 voters can be identified, the mere ability to identify the voters does not mean the errors in this election can be negated. The election was held on May 21, 2002. To call voters into court to declare their vote on a later date would be to hold the election for those voters anew. The 183 voters cast no ballots in the

Justice of the Peace race, and thus, there are no legal votes to be added or illegal votes to be excluded. It is not possible to trace what does not exist. Votes that were never cast obviously cannot be discovered and determined at a later time. In this case, the errors rendered the result uncertain, and a free election was defeated under article 3, section 2, of the Constitution and under our holding in *Patton* and the cases that followed *Patton*.

### Slight Deviation and Lack of Fraud

Whitley admits there was an error or a "wrong" in failing to include the Justice of the Peace race on all ballots, however, he argues that the proper analysis in this case is to determine whether that failure constitutes a slight deviation from the legal requirements, and if so, then the election should be declared valid. He also argues that there is a lack of fraud in this case, and that means the election need not be invalidated.

We have already addressed the issue of fraud. The existence of fraud may be relevant in the analysis in a case where fraud is present; however, fraud is not a required element under the Constitution, that must be shown before an election may be invalidated.

In arguing a slight deviation, Whitley points out that 1715 ballots were cast, and that only 183, or slightly more than ten percent, did not include the Justice of the Peace race. Whitley argues that close to ninety percent of voters had a chance to vote in the Justice of the Peace race, and that of those presented with a chance to vote in the race the majority voted for Whitley. Whitley thus concludes that he received a majority vote, and that any deviation was slight and should be ignored. Whitley cites *Womack, supra* for the proposition that where the deviation is slight, and the error is caused by an election official, legal voters should not be disenfranchised by the misconduct of another, in this case election officials who failed to provide the correct ballot. As already quoted, this court in *Womack* stated, "It is also well settled that the courts do not favor disenfranchising a legal voter because of the misconduct of another person, such as an election official." *Womack*, 340 at 149. However, as also already discussed, this court in *Womack* quoted *Spires, supra* where this court stated that:

> elections will not be invalidated for alleged wrongs committed unless those wrongs were such to render the result doubtful. Put in

> other terms, we have said that the failure to comply with the letter of the law by election officers, especially in matters over which the voter has no control, and in which no fraud is perpetrated, will not as a general rule render an election void, unless the statute expressly makes it so. In sum, the courts do not favor disenfranchising a legal voter because of the misconduct of another person.

*Spires,* 310 Ark. at 434. Whitley fails to recognize that according to the law he cited, where the result of the election is uncertain or doubtful, it will be voided. Whitley argues in essence that although the result of the election might be doubtful, because the error causing the doubt is slight it should be ignored. This court early on stated that where the result is uncertain, "the whole poll must be held for naught." *Patton,* 41 Ark. At 125. Naught means nothing or a state of utter ineffectualness. *Webster's Third New International Dictionary* 1508 (1993). In other words, where the result is doubtful or uncertain, there is nothing to analyze regarding the results.

Whitley asks this court to declare him the winner because when the total number of those who voted in the election is considered, almost ninety percent received ballots including the Justice of the Peace race, and the majority of those who chose to vote in the race voted for Whitley. Thus, he argues the wrong is slight and must be ignored. However, the wrong cannot be ignored in this case because the outcome is uncertain. We cannot know how the 183 people who received the defective ballots would have voted. Are we to assume that as in the votes cast by ballots including the Justice of the Peace race, roughly a third would choose to vote in the race? If we make that assumption, then there would be sixty-one voters who would have cast votes in the Justice of the Peace election. Fifty-six votes for Cranford would be sufficient to tip the balance in his favor. How do we know how those fifty-six or more votes would have been cast?

█ It is true that mere failure of an election official to comply with the letter of the law will not void an election unless the statute expressly requires that outcome. There is no statute dictating that this omission by election officials requires that the election be voided in this case, however, the fact remains that it is impossible to determine who won this election. The result of the election is uncertain and a nullity. There is no merit to Whitley's argument that because ninety percent of those who voted could have voted in the Justice of the Peace race, those who were not

permitted to vote may simply be dismissed. Those who did not receive the opportunity to vote may not be simply dismissed. Under the equal protection clause of the United States Constitution every voter is entitled to a vote equal in weight to the vote of every other voter in a statewide primary. *Taylor v. Clinton*, 284 Ark. 170, 680 S.W.2d 98 (1984) (citing *Gray v. Sanders*, 372 U.S. 368 (1963)). The election was not free and equal as required under article 3, section 2, of the Arkansas Constitution. As noted in *Womack, supra,* this court will not void an entire election due to misconduct of election officials where to do so would undermine the freely expressed will of the majority of the voters. However, in this case the will of the majority is simply unknown and uncertain.

### Denial of the Right to Participate in the Election

Whitley also argues that the trial court erred in finding that the omission of the Justice of the Peace race denied the voters receiving the defective ballots the right to participate in the election. Whitley argues:

> This Court should recognize and declare that voters have an obligation in the election process. Voters have a duty to go to the polls with the knowledge and understanding of the contests for which they will be presented. They have a duty to read carefully and review the ballot to determine if it properly represents all of the candidates. Such error or omission on the part of voters should not be an opportunity for this court to disregard or disenfranchise those voters who did carefully read and review the ballot.

Whitley further argues that those who received the defective ballots "carelessly chose to ignore the omission or in the alternative, intentionally chose to disregard their opportunity to vote in the contest." As support for his argument, Whitley cites *Womack, supra; Rubens, supra; Henard, supra; Files, supra.* These cases do not place an affirmative duty on a voter to examine the ballot for accuracy before voting. Whitley provides neither authority nor convincing argument. We have long held that we do not consider arguments without convincing argument or citation to authority in support, where it is not apparent without further research that these arguments are well-taken. *Roberts v. Priest*, 341 Ark. 813, 20 S.W.3d 376 (2000).

*New Trial Motion*

■ Whitley further argues that the trial court erred in denying his motion for a new trial based on his post-hearing discovery that no new election would be held. Whether to grant a motion for a new trial based on alleged newly discovered evidence is under an abuse of discretion standard. *Piercy v. Wal-Mart*, 311 Ark. 424, 844 S.W.2d 337 (1993). The trial court did not abuse its discretion in denying the motion for a new trial.

■ Whitley argues that it would be better to let the election stand as certified than to void the results and disenfranchise those who voted. However, there are no valid votes and no voters to disenfranchise. A void election is a nullity. *Patton, supra.* That means there was no valid decision by voters. Additionally, the trial court is not the legislative body and therefore could not set a new election and has no control over setting an election. *Files, supra.*

■■ Also, contrary to Whitley's argument, when the trial court declared the election void, the trial court did not create a vacancy under Ark. Code Ann. § 7-1-101 (Repl. 2000). A vacancy in nomination is created when the person nominated received the majority of votes but cannot or will not accept the nomination. *Id.* There was no valid election, and no nomination. Therefore, the electorate is left as if no election had been held. The trial court did not abuse its discretion in denying the motion for a new trial.

Affirmed.

IMBER, J., dissents.

GLAZE, J., not participating.

ANNABELLE CLINTON IMBER, Justice, dissenting. Today the majority does that which in its entire recorded history this court has never done — it upholds the voiding of an election where there has been no allegation of fraud, intimidation, violence, or coercion. This holding thus disenfranchises those voters who freely and legally cast their votes in this election and I must strongly dissent.

The facts are largely undisputed in this case. Through error or accident, in the Hot Spring County Democratic Preferential Primary on May 21, 2002, 183 ballots were cast which should have

included the District 4 Justice of the Peace contest but did not. Out of a total of 1715 ballots that were cast, 989 voters chose not to vote in the District 4 race, 299 votes were cast for appellant Ronald Whitley, 244 votes were cast for appellee James Cranford, and 183 ballots were missing from the race completely. In other words, 1532 voters were presented with proper ballots and either chose not to vote at all in the race or chose to vote for either Whitley or Cranford. The decision by the trial court to void the election thus disenfranchises this majority of 1532 voters in favor of the 183 voters who were not given the opportunity to vote in the District 4 race.

Only twice in this court's history have the circumstances surrounding an election been egregious enough for us to hold the election should be voided. The first took place over a hundred years ago during the reconstruction period following the Civil War and the passage of the Thirteenth and Fourteenth Amendments. This was the case of *Patton v. Coates*, 41 Ark. 111 (1883). In *Patton*, elections were held in which voters were being threatened and intimidated if they attempted to vote for the candidates of their choice. In some cases, violence ensued and some voters were compelled to vote for a particular candidate or were kept from voting at all. *Id*. In addition to the allegations of threats, violence, and intimidation, allegations of fraud were rife in several townships and one ward. *Id*. A trial was held and the circuit court refused to void the election or suppress the votes from the precincts in question. *Id*. This court, after reviewing the evidence of the violence and fraud, reversed the circuit court:

> There is a distinction, in the nature of things, between particular illegal votes which may be proven and exactly computed, and which certainly ought to be excluded, wherever cast, and the effects of fraudulent combinations, coercion, and intimidation. *It can never be precisely estimated how far the latter extend*. Fraud is secret, and timidity shrinks from observation. Their effects depend on moral perversions, nervous organizations and constitutional idiosyncracies. They cannot be arithmetically computed. Awe is silent and undemonstrative. Peace may be abject as well as the result of satisfaction. Yet it cannot be said that elections are "free and equal" where fraudulent combinations for illegal voting override honest votes, or where fear

deters from the exercise of free will, although there may be no turbulence.... [W]herever such practices or influences are shown to have prevailed, not slightly and in individual cases, but generally, and to the extent of rendering the result uncertain, the whole poll must be held for naught.

*Id.* at 124-25 (emphasis added).

This passage is important because it sets the threshold for courts as to when an election should be voided. The majority focuses on the words "to the extent of rendering the result uncertain" and, because it is uncertain in the instant case whether Whitley or Cranford would have won had those 183 votes been cast, the majority holds for naught the 1532 voters who expressed their will in either choosing a candidate or choosing not to vote at all in the District 4 race. This is contrary to the letter and spirit of *Patton. Patton* tells us that when (1) practices such as fraud, violence, and intimidation have prevented voters from exercising their free will *and* (2) due to those practices the result has been rendered uncertain, only then should an election be voided.

The majority would have us void any election in which, through mistake or accident, an election result is uncertain. We have consistently refused to do so in the past.[1] In the case of *Files v. Hill*, 268 Ark. 106, 594 S.W.2d 836 (1980), there were numerous irregularities in an election, including voting machines that did not operate properly to the extent that some voters were not even allowed to vote, write-in votes that were not properly counted, and unclear or erroneous instructions by election officials. When Files challenged the election, he presented evidence of 1522 persons who had tried to vote for him but were prevented from doing so because of faulty voting machines or an inability to

---

[1] The majority cites to three cases, *Phillips v. Mathews*, 203 Ark. 100, 155 S.W.2d 716 (1941), *Phillips v. Rothrock*, 194 Ark. 945, 110 S.W.2d 26 (1937), and *Swanberg v. Tart*, 300 Ark. 304, 778 S.W.2d 931 (1989), to show that this court has voided, or is willing to void, elections when the result is uncertain but there is no allegation of fraud, intimidation, violence, or coercion. None of these cases is on point. *Mathews* and *Rothrock* both involved elections that were unauthorized — not elections that were legally authorized, as was the election in the instant case. *Swanberg* involved an unsuccessful election challenge in which the appellants could not even prove that any voters were disenfranchised. There is nothing in the *Swanberg* decision to indicate that we would have voided that election on an uncertain result alone. To the contrary, in no case have we ever held a legally-authorized election void — even if the results were uncertain — without proof of fraud, intimidation, violence, or coercion.

write-in a candidate. *Id.* Because Files had lost by more than 1522 votes, and because he could produce no evidence as to how many other voters would have voted for him had they been given the opportunity, the trial court refused to void the election and dismissed the claim. *Id.* On appeal, we affirmed the trial court, holding that even these numerous irregularities were not the "wrongs" spoken of in *Patton* serious enough to void an election:

> . . . As stated in [*Patton v. Coates*], if the wrong be not so general and serious, the court cannot safely proceed beyond the exclusion of particular illegal votes or the supply of particular legal votes rejected. So far as the allegations in this complaint go, they would justify at most only the addition of the particular votes of the 1522 persons listed. Furthermore, the results reached in Patton *would not have been reached had it not been for the elements of threats and acts of violence. Jones v. Glidewell,* 53 Ark. 161, 13 S.W. 723, 7 L.R.A 831. Neither is there any allegation of coercion, *which was essential in Jones.*

*Id.* at 113, 594 S.W.2d at 840 (emphasis added).

Contrary to the majority's assertion, the *Files* court does require some extreme "wrong," such as fraud, violence, intimidation, or coercion, before it will render an election void. If no such circumstances exist, the only remedy is to add any legal votes that were rejected or subtract any illegal votes that were cast, if those votes can be traced. Here, Cranford presented only one person, his brother Russell Cranford, to say that he would have voted for Cranford had he been given the opportunity.[2] Under the *Files* analysis, the most these allegations justify is adding that one vote to the total, which would not change the result of the election. The majority's holding renders our precedent in *Files* questionable at best.

The case of *Jones v. Glidewell,* cited in *Files, supra,* was an 1890 case in which Glidewell was certified as the winner of an election for Pulaski County treasurer. Jones contested the election, and the trial court found that, while Jones did indeed win the majority of votes, those votes were obtained through illegal practices "of such character, and so wide spread, as to avoid the election." *Jones v. Glidewell,* 53 Ark. 161, 166, 13 S.W. 723, 724 (1890). During the

---

[2] Cranford made no attempt to trace any other votes, although there existed a numbered list of voters who could have easily been traced.

voting, many voters were required to open their ballots to show whether they had voted for the Democratic or Republican candidate. *Id.* This had followed a period of widespread threats of "social ostracism, of expulsion from the community, of personal violence, and of persecutions from Republican candidates for township offices [if the Democrats won]." *Id.* at 168, 13 S.W. at 724.

We affirmed the trial court's voiding of the election — notably, the only time we have done so — because the coercive act of requiring voters to open their ballots was of such a nature as to render the election one that was not free and equal. *Id.* In discussing the coercion that was perpetrated on the voters, we said, "No course *which in itself* violates the law and tends to prevent a free election, can be justified." *Id.* at 175, 13 S.W. at 727 (emphasis added). Obviously, the act of requiring a voter to disclose his secret ballot is one which in itself violates the law, and because it is such a coercive act, it prevents a free election.

In a very recent case in which constitutional violations were present, we refused to void an election even though fraud and misconduct were alleged regarding approximately 1,000 votes of the total 6,000 votes cast, because no fraud or misconduct was alleged in regard to the other 5,000 votes. *See Womack v. Foster,* 340 Ark. 124, 8 S.W.3d 854 (2000). We stated in *Womack* that "the courts do not favor disenfranchising a legal voter because of the misconduct of another person, such as an election official." *Id.* at 149, 8 S.W.3d at 869. In the instant case, the majority is willing to disenfranchise the legal votes of 543 voters who cast ballots in the District 4 race, and another 989 voters who cast legal ballots and chose not to vote in the election at all. To disenfranchise these 1532 voters in favor of 183 who were not allowed to vote flies in the face of our precedent, both recent and ancient.

None of the elements spoken of in *Patton* or *Jones,* and reiterated in *Files,* are present in this case. There has been no allegation of fraud, no threats, no violence, and no coercion. A mistake resulted in the District 4 race being left off of 183 ballots that were cast — certainly a much less egregious wrong than those present in *Files v. Hill, supra,* where well over a thousand voters wanted to vote in an election and attempted to do so, but were prevented by faulty voting machines. Yet we did not void the election in *Files* and we should not affirm the trial court's voiding of the District 4 race in this case.

We have consistently held, for over a century, that the voiding of an election is an extreme measure to which we have resorted only in cases where fraud, threats of intimidation, violence, or coercion cause an election result to be uncertain. Because the majority breaks from our long line of precedent, I must respectfully dissent.